**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-997

ESTATE OF DEZAREE NICOLE ARCHULETA,
by and through its personal representative Shelly Romero, and
SHELLY ROMERO, individually,

      Plaintiffs,

v.

WELLPATH, LLC,
H.I.G. CAPITAL, LLC,
CHRISTINE MOHR, in her individual and official capacities,
EDWARD KEAVENY, in his individual and official capacities, and
MICHELLE WESOLOWSKI, in her individual and official capacities,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiffs, by and through their attorneys Andy McNulty and Mari Newman of NEWMAN |

MCNULTY, respectfully allege as follows:

### <u>INTRODUCTION</u>

      1.      Dezaree Archuleta died by suicide at the El Paso County Criminal Justice Center

("CJC") after her cries for help were repeatedly ignored by Wellpath,[1] the El Paso County CJC's

medical and mental health services provider, and its officials. Wellpath and its officials were

aware of, but callously ignored the almost constant pleas for help from Ms. Archuleta and signals

that she was at significant and immediate risk of suicide.

---

[1] The references to Wellpath, its predecessor companies, and its officials, equally apply to H.I.G.
Capital, LLC ("HIG") as it operates Wellpath (and operated its predecessor companies) as an
alter ego subsidiary. *See Estate of Miller v. Cty. of Sutter*, No. 2:20-cv-00577-KJM-DMC, 2020
U.S. Dist. LEXIS 204517 (E.D. Cal. Oct. 30, 2020).

2.      Over the twenty-three days of her incarceration before her death, Ms. Archuleta's medical file included an astounding sixteen separate incidents of Ms. Archuleta expressing her suicidality and multiple other risk factors that would have made it obvious to any mental health provider or lay person that she had a serious and substantial risk of suicide. She also reported having auditory and visual hallucinations. Defendants were, or should have been, aware that Ms. Archuleta experienced nearly every single risk factor on the Columbia-Suicide Severity Scale (C-SSRS).

3.      Even though Ms. Archuleta was crying out for help, Defendant Edward Keaveny, a Wellpath official, repeatedly removed Ms. Archuleta from suicide watch, allowing Ms. Archuleta to engage in repeated and horrific acts of self-harm throughout her incarceration. Less than a week before her death, after being removed from suicide watch by Defendant Keaveny, Ms. Archuleta was found naked in her cell engaging in extreme self-harm, including using a screw to create massive gouges in her thighs. When Defendant Keaveny was called by El Paso County deputies to speak with Ms. Archuleta after the first of these incidents, Ms. Archuleta specifically requested to be seen by a psychiatrist so that she could receive the medication that she had previously been prescribed and successfully taken. In response, Defendant Keaveny told Ms. Archuleta that the psychiatrist was impossible to reach on the phone, so it was not an option for Ms. Archuleta to receive her psychotropic medications while in the CJC. Instead of providing Ms. Archuleta the help she so desperately needed and repeatedly requested, Defendant Keaveny callously handed her a few pamphlets and told her to use her coping skills. He did not place her back on to suicide watch in order to keep her safe. Mere hours after Defendant Keaveny ignored her cries for help, Ms. Archuleta engaged in another act of serious self-harm by punching herself in the face until she bled.

4.      Days after these two serious instances of self-harm, and despite Ms. Archuleta's direct statements that she was experiencing constant suicidal ideation and suffering visual and auditory hallucinations, Defendants Keaveny and another Wellpath official, Defendant Michelle Wesolowski, inexplicably again removed Ms. Archuleta from suicide watch. The day after being removed from suicide watch, Ms. Archuleta predictably committed suicide. Ms. Archuleta died just an hour after her last reported statements to Defendant Keaveny that she was experiencing constant suicidal ideation and was suffering visual and auditory hallucinations. Despite this, Defendant Keaveny made the conscious choice to not move Ms. Archuleta onto suicide watch.

5.      Ms. Archuleta died by hanging herself in her cell from a metal grate that a high-level official at Wellpath, Defendant Christine Mohr, knew was a major suicide risk, but never addressed. Had Wellpath officials showed even the slightest concern for human life, Ms. Archuleta would still be alive today.

6.      The investigation into Ms. Archuleta's death revealed the egregiousness of the actions of Wellpath and its officials. Multiple El Paso County deputies stated during that investigation that it was obvious to everyone, from staff to other inmates, that Ms. Archuleta was suicidal. It was so clear to them that Ms. Archuleta should have remained on suicide watch that they openly questioned the decision-making of Wellpath officials and made sure to document the obviously callous decision-making by Defendant Keaveny in official reports.

7.      Wellpath has repeatedly shown that it has no concern for the well-being of inmates. During Wellpath's three-year tenure at the El Paso County CJC, from 2020 until 2023, there were over fifteen deaths in CJC. Eight of those deaths occurred in 2022 alone. The victims of these deaths were disproportionately people of color, and the deaths were directly caused by Wellpath's deliberate indifference and neglect of the people whose care it was responsible for

providing. Without accountability, Wellpath will carry on with their negligence and indifference toward suicidality and human suffering. Mr. Archuleta's family demands accountability from Wellpath. Being locked in jail should not be a death sentence.

## JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

9.      Jurisdiction supporting Plaintiffs' claim for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988 and C.R.S. § 13-21-131.

10.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

11.     Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

12.     Plaintiffs sent a statutorily compliant CGIA notice of claims to all Defendants within the statutorily required period.

## PARTIES

13.     At all times relevant to this litigation, the decedent, Dezaree Archuleta, was a citizen of the United States of America and a resident of and domiciled in the State of Colorado.

14.     At all times relevant to the subject matter of this litigation, Shelly Romero, personal representative of the Estate of Dezaree Archuleta, and also a Plaintiff bringing claims

individually, was Ms. Archuleta's mother and has been a citizen of the United States and a resident of and domiciled in the State of Colorado.

15.     Defendant Wellpath, LLC ("Wellpath") is a Delaware limited liability company doing business in Colorado. Its principal office street address is 1283 Murfreesboro Pike, Ste. 500, Nashville, TN 37217. Its registered agent is Corporate Creations Network Inc., 155 E. Boardwalk, #490, Ft. Collins, CO 80525. Wellpath was created by its parent entity, the private equity group H.I.G. Capital, after H.I.G. Capital acquired jail medical contractor Correct Care Solutions, LLC, ("CCS") in 2018. Shortly thereafter, CCS and another jail medical contractor, Correctional Medical Group Companies, were merged, by the parent H.I.G. Capital, to form Wellpath.

16.     At all times relevant, Wellpath contracted with El Paso County to provide medical and mental health care at the CJC. Wellpath is sued vicariously for the negligence and constitutional violations of its employees and directly for its own deliberate indifference, and negligent training, staffing, and supervision of staff working at El Paso Jail. Wellpath is a private corporation not entitled to immunity under the Colorado Governmental Immunity Act or any other law.

17.     Defendant H.I.G. Capital, LLC is a private equity firm doing business in Colorado. It is the owner, manager and partner of Wellpath. It contracts to provide delivery of medical services to inmates and was (and is) responsible for the management, hiring, retaining, training, and supervising of the conduct, policies and practices, customs, standards, finances, of its employees, managers, supervisors, contractors, leaders (including Defendants Wesolowski, Keaveny, and Mohr) in the service of providing medical care to inmates, including Ms. Archuleta, at the CJC. Wellpath executives, directors, supervisors, and mental health providers

act on behalf of H.I.G. Capital. H.I.G. Capital is the alter ego of Wellpath, and/or alternatively Wellpath acts on behalf of H.I.G. Capital which has control over it. H.I.G. Capital is a private corporation not entitled to immunity under the Colorado Governmental Immunity Act or any other law.

18.     At all times relevant to this litigation, Defendant Christine Mohr was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of her duties and employment in her capacity as a psychologist and mental health administrator employed by Wellpath. As the mental health administrator at CJC, Defendant Mohr was responsible for overseeing all operations at the CJC related to mental health services, including establishing procedures, hiring staff, and ensuring that all mental health services providers were properly trained.

19.     At all times relevant to the subject matter of this litigation, Defendant Edward Keaveny was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of his duties and employment in his capacity as a Licensed Marriage and Family Therapist employed by Wellpath.

20.     At all times relevant to this litigation, Defendant Michelle Wesolowski was a citizen of the United States and a resident of and domiciled in Colorado and was acting under color of state law and within the scope and course of her duties and employment in her capacity as a Licensed Professional Counselor employed by Wellpath.

## **FACTUAL ALLEGATIONS**

### **Dezaree Archuleta was a beloved daughter and sister.**

21.     Dezaree Archuleta was, and will always be, one of a kind. Her mother, Shelly

Romero, describes her as special and beautiful from the second she was born. Ms. Romero

remembers Ms. Archuleta as a perfect baby who never fussed or cried.



*Dezaree Archuleta as a baby*

22. Ms. Archuleta was part of a close-knit family that she loved very much.



*Ms. Archuleta with her mother and siblings*

23.     Ms. Archuleta and her mother shared an unconditional love for one another. Even

as she grew older, Ms. Archuleta made sure that her mother knew that she loved her and that

they could make it through anything as long as they had each other.



*Dezaree Archuleta and her mother, Shelly*

24.    Ms. Archuleta's siblings describe her as loyal, tough, caring, ambitious, beautiful, and a loving soul. Ms. Archuleta was not one to turn her back on someone when times got a little hard, or if even if someone wronged her. She always looked out for others before herself. She was a kind, giving, caring, and big-hearted person who would give a stranger the shirt off her back.

25.    According to her sister, Ashley Romero, Ms. Archuleta was funny and could always make light of any situation. Ms. Archuleta made her sister feel good about herself and she was always complimenting Ms. Romero. Ms. Romero especially remembers how Ms. Archuleta

was extremely compassionate to animals. Ms. Archuleta was more than a sister to Ms. Romero; she was a friend and a protector.



*Ms. Archuleta with her sisters*

26.     Ms. Archuleta's sister, Shayla Romero, describes Ms. Archuleta as having the biggest heart. According to Ms. Romero, Ms. Archuleta would give someone her last dollar if they asked, and she would give them her jacket if it was freezing outside and all she had on was a t-shirt. Ms. Archuleta had a bright smile, even if she had nothing but pain her heart. Ms. Romero remembers Ms. Archuleta as always dancing. Ms. Archuleta was the star and light of the room. She genuinely cared about the people in her life.



*Ms. Archuleta with her sisters*

27.    Ms. Archuleta was a talented artist. She could rap, dance, and draw. She was passionate about her music.

28.    The loss of Ms. Archuleta was devastating to her entire family. Her family members will never fully recover from her loss, and there is not a day that goes by that they do not think about Ms. Archuleta.

**Suicide is a serious and well-understood mental health risk in local jails, including the CJC.**

29.    According to a 2010 study by the Department of Justice's National Institute of Corrections ("NIC"), suicide is the leading cause of death in local jails in the United States. Per the NIC study, the suicide rate of local jail detainees is several times higher than that of the

general population. 2021 studies by the United States Department of Justice's Bureau of Justice Statistics confirm that suicide remains the leading cause of death in local jails across the country.

30.     In response to the troubling frequency of suicide in local jails, corrections officials have developed a well-understood profile of local jail detainees or inmates who present a heightened risk of suicide: young adult or middle-aged inmates with a history of mental illness. Additionally, there are several well-known red flags that all reasonably trained jail staff look for as indicators of heightened suicide risk in a detainee or inmate, including: previous suicide attempts; suicidal ideation; self-harming behavior; history of alcohol or substance abuse; and recent incarceration or recent court proceedings where the detainee or inmate received bad news about their legal status.

31.     Wellpath has extensive and, at the time of Ms. Archuleta's death, very recent experience with this disturbing trend.

32.     Wellpath took over the contract to provide medical and mental health care at the CJC on or about January 1, 2020.

33.     During the previous year, 2019, two CJC inmates died by suicide. In November, a 32-year-old man died and was found hanging in his cell. On June 9, 2019, Holly Peck also died by suicide in the CJC.

34.     Wellpath was thus on specific notice that the risk of detainee and inmate suicide was not only a very serious risk in its jails nationwide, but also a very serious risk at the CJC.

35.     Several inmates also died of suicide after Wellpath assumed responsibility for mental health care at the CJC.

36.     Very soon thereafter, in May 2020, Michael Roach died by suicide at the CJC.

37.    Two months later, in July 2020, Shawn Meehan died by suicide at the CJC. Mr. Meehan had a reported history of mental health issues, yet Defendants provided a recklessly insufficient level of mental health care during his incarceration. A few days prior to his death, Mr. Meehan submitted a kite to Wellpath mental health workers asking for help and saying he wanted to hurt himself. Despite this obvious signal that mental health intervention was necessary, as part of a continuing pattern of deliberate indifference by Wellpath officials at the CJC, Defendants started no alerts or precautions and failed to place him on suicide watch before he died.

38.    On February 10, 2021, Maxwell Kirwan attempted suicide at the CJC. Mr. Kirwan had obvious and serious mental health issues. He had previously attempted suicide in the CJC in 2014 by jumping head-first from a flight of stairs. During this suicide attempt, Mr. Kirwan seriously injured himself. Mr. Kirwan attempted suicide in the almost exact same way in 2021 when he jumped head-first off of a balcony in the CJC. Wellpath officials did nothing to prevent him from again attempting suicide in 2021. Like Ms. Archuleta, Mr. Kirwan was not on suicide watch when he attempted suicide despite the fact that he was suffering from obvious psychosis and had multiple other risk factors for suicide.

39.    In March of 2021, there was a third suicide at the CJC under Wellpath's watch.

40.    2022 was one the deadliest years at the CJC. Over the course of the year, nine inmates died in the jail.

41.    These deaths were caused by Defendants' failure to uphold their constitutional and moral responsibility for the health and welfare of the people within their custody and control.

42.    Each of these deaths put Defendants on notice regarding the risks of other inmates suffering from mental health struggles, including Ms. Archuleta.

13

**<u>Wellpath officials were deliberately indifferent to Ms. Archuleta's obvious, serious mental health needs, and unjustifiably failed to prevent her from killing herself.</u>**

43.    On or about May 17, 2022, Dezaree Archuleta was arrested and booked into the CJC.

44.    Throughout Ms. Archuleta's incarceration at the CJC, she demonstrated consistent, ongoing, and obvious signs that she was suicidal and at significant risk of self-harm.

45.    On May 18, 2022, at approximately 4:15 a.m., Ms. Archuleta was interviewed as part of the intake process for the CJC. During the intake interview, Ms. Archuleta told Wellpath Licensed Practical Nurse Anthony Lupo that she wanted to kill herself. Ms. Archuleta also told Nurse Lupo that she had attempted suicide less than a year before by trying to cut and stab herself. Nurse Lupo observed bilateral scarring on Ms. Archuleta's arms from past self-harming behavior and suicide attempts. Nurse Lupo also observed that Ms. Archuleta presented as disheveled and anxious. Because of Ms. Archuleta's responses during intake, Nurse Lupo marked Ms. Archuleta as an urgent referral to mental health for further evaluation and placed her on suicide watch. Nurse Lupo noted all of this information in Ms. Archuleta's file, providing Defendants specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at high risk of suicide.

46.    On May 18, 2022, at approximately 9:50 p.m., Ms. Archuleta spoke with Wellpath official Robert King for a Suicide Watch Initial Assessment for Mental Health. Mr. King noted that Ms. Archuleta had told the deputies on intake that she wanted to kill herself. During the screening, Ms. Archuleta also told Mr. King that she had wished she was dead. Ms. Archuleta told Mr. King that she had taken steps to prepare to commit suicide sometime in the time period between the last three months and a year. Ms. Archuleta told Mr. King that she had

previously attempted suicide during the previous summer by taking too many pills. Mr. King
noted that Ms. Archuleta had suicidal ideation with a concrete plan for killing herself. Mr. King
further observed that Ms. Archuleta appeared disheveled and that she had a flat affect. Mr. King
noted that Ms. Archuleta presented with a number of risk factors for self-harm and suicide,
including prior suicide attempts, impulsivity, a recent endorsement of wanting to commit suicide,
and her limited engagement with Mr. King during the assessment. Mr. King noted that Ms.
Archuleta had previously been prescribed medication. Mr. King noted all of this information in
Ms. Archuleta's file, providing Defendants additional specific detailed information regarding
Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's
file put Defendants on notice that Ms. Archuleta was at high risk of suicide.

47.     On May 19, 2022, Ms. Archuleta was involved in an altercation with another
inmate. That inmate, when interviewed about the altercation, told Deputy Dennis Stevens that he
could tell Ms. Archuleta seemed "not all there in the head." When Ms. Archuleta was later
interviewed about the incident, she told Deputy Stevens that the voices in her head told her to do
things and that she thought she needed to be in a mental hospital. Deputy Stevens noted all of
this information in Ms. Archuleta's file, providing Defendants additional specific detailed
information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These
notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at high risk of
suicide.

48.     On May 19, 2022, at approximately 2:02 p.m., Ms. Archuleta spoke with
Defendant Michelle Wesolowski, a Wellpath Licensed Professional Counselor employed by
Wellpath, for a daily follow-up because Ms. Archuleta was on suicide watch. During that
conversation, Ms. Archuleta told Defendant Wesolowski that she engaged in cutting to feel

something and as a way to cope with her depression. Ms. Archuleta told Defendant Wesolowski that she had thoughts of killing herself and that she had taken actions to carry out those thoughts. Defendant Wesolowski noted that Ms. Archuleta had previously attempted suicide and presented with numerous risk factors indicating a risk of suicide, including: a prior suicide attempt, impulsivity, and the fact that this was her first time in adult incarceration. Defendant Wesolowski noted that Ms. Archuleta had previously told a deputy that she wanted to kill herself. Defendant Wesolowski observed that Ms. Archuleta was disheveled and depressed, had a blunted affect, and was speaking softly and in one-word answers. Defendant Wesolowski noted that Ms. Archuleta's suicide risk was intermediate. Because of the obvious risk of suicide by Ms. Archuleta, Defendant Wesolowski kept Ms. Archuleta on suicide watch. Defendant Wesolowski noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at significant risk of suicide.

49.     On May 20, 2022, at approximately 1:15 p.m., Ms. Archuleta met with Wellpath Licensed Marriage and Family Therapist, Defendant Edward Keaveny, for a daily follow-up because Ms. Archuleta was on suicide watch. Ms. Archuleta told Defendant Keaveny that she was feeling down and sleeping a lot. Defendant Keaveny noted that Ms. Archuleta continued to have suicidal ideation. Defendant Keaveny observed that Ms. Archuleta was disheveled and had a blunted affect. Defendant Keaveny also observed that Ms. Archuleta's memory was impaired. Ms. Archuleta told Defendant Keaveny that she wished she was dead. Defendant Keaveny noted that Ms. Archuleta presented with a number of risk factors for suicide and self-harm, including that: she was detoxing from drugs and alcohol; she suffered from major depression, mania,

hallucinations, and delusions; she relayed feelings for hopelessness, guilt, burden, worthlessness; she was experiencing severe anxiety and agitation; she suffered flashbacks; she was placed in segregation; there were reports that she was giving items away; she was previously placed on suicide watch in jail; she was young; she had a childhood history of trauma and abuse; she had a family history of suicide attempts; and she had a history of domestic abuse and violence.

50.     Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing Defendants specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file demonstrate that he was on notice – and also put other Defendants on notice – that Ms. Archuleta was at significant risk of suicide.

51.     Despite these obvious indications that Ms. Archuleta continued to be at risk of suicide, Defendant Keaveny took Ms. Archuleta off suicide watch.

52.     On May 21, 2022, Ms. Archuleta reported to an El Paso County deputy that she was experiencing command auditory hallucinations and suicidal ideation. The deputy told Lori Seitz, a Wellpath official, about Ms. Archuleta's command auditory hallucinations and suicidal ideation, and Ms. Seitz placed Ms. Archuleta on suicide watch. Ms. Seitz noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at significant risk of suicide.

53.     Thereafter, Ms. Archuleta was referred to speak with Raymond Carrington, a Licensed Professional Counselor for Wellpath. A deputy also previously informed Mr. Carrington that he had observed Ms. Archuleta acting impulsively. Mr. Carrington spoke with

Ms. Archuleta at approximately 8:22 p.m. on May 21, 2022, and noted that Ms. Archuleta was experiencing command auditory hallucinations and suicidal ideation, and that she was acting impulsively. According to Mr. Carrington's notes, Ms. Archuleta told Mr. Carrington that she had specific thoughts about ending her life and had an intention of acting on those thoughts. Ms. Archuleta also told Mr. Carrington that she had taken action to prepare to die. Ms. Archuleta told Ms. Carrington that she had self-harmed not long ago. Mr. Carrington noted that Ms. Archuleta had a number of risk factors for suicide and self-harm, including that: she had prior suicide attempts; she suffered from major depression, mania, hallucinations, and delusions; she relayed feelings for hopelessness, guilt, burden, worthlessness; she was impulsive; she had engaged in non-suicidal self-injury; she was placed in segregation; she was facing serious charges; and this was her first incarceration as an adult. Mr. Carrington noted that Ms. Archuleta's suicide risk was intermediate. Because of this, Ms. Archuleta remained on suicide watch. Mr. Carrington noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at significant risk of suicide.

54.     On May 23, 2022, at approximately 4:06 p.m., Ms. Archuleta spoke with Defendant Keaveny again. Ms. Archuleta told Defendant Keaveny that she continued to experience suicidal ideation and that the only thing keeping her from committing suicide was a fear of death that she only experienced sometimes. Ms. Archuleta told Defendant Keaveny that she had self-harmed approximately three weeks ago. Defendant Keaveny observed that Ms. Archuleta appeared disheveled and had a flat affect. Ms. Archuleta told Defendant Keaveny that she was still experiencing auditory hallucinations and had been for months. Defendant Keaveny

noted that Ms. Archuleta had specific plans as to how she would commit suicide and that she had taken actions in furtherance of those plans. Defendant Keaveny noted that Ms. Archuleta had risk factors for suicide, including that: she did not have adherence to psychotropic medication (because Defendants had never scheduled her to see a psychiatrist and, therefore, had no access to her critical psychotropic medication); she had prior suicide attempts; she suffered from major depression, mania, hallucinations, and delusions; she relayed feelings for hopelessness, guilt, burden, worthlessness; she was impulsive; she was placed in segregation; there were reports of her giving items away; she had previously been placed on suicide watch in jail; she was an adolescent; she had a family history of suicide attempts; and she had a history of domestic abuse and violence. Defendant Keaveny again estimated Ms. Archuleta's suicide risk at intermediate. Because of this, Ms. Archuleta remained on suicide watch. Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file indicated that Defendant Keaveny was on notice, and put other Defendants on notice, that Ms. Archuleta was at significant risk of suicide.

55.    Sometime between 9 a.m. and 11 a.m. on the morning of May 25, 2022, Defendant Keaveny met with Ms. Archuleta. Ms. Archuleta told Defendant Keaveny that she was feeling lazy, and he noted that this was a warning sign of suicide. Defendant Keaveny observed that Ms. Archuleta had a blunted affect. Ms. Archuleta told Defendant Keaveny that she continued to have suicidal ideation and auditory hallucinations. Defendant Keaveny noted that Ms. Archuleta continued to have risk factors for suicide, including that: she had prior suicide attempts; she suffered from major depression, mania, hallucinations, and delusions; she relayed feelings for hopelessness, guilt, burden, worthlessness; she was impulsive; she had engaged in

non-suicidal self-injury; she was placed in segregation; she had previously been placed on suicide watch in jail; she was an adolescent; she had a family history of suicide attempts; and she had a history of domestic abuse and violence. Despite knowing Ms. Archuleta presented with all these obvious risk factors for suicide and that Ms. Archuleta had a sustained – indeed, almost daily – history of reporting suicidal ideation while in the CJC, Defendant Keaveny took her off suicide watch. As before, Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing Defendants specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file indicated that Defendant Keaveny was on notice, and put other Defendants on notice, that Ms. Archuleta was at significant risk of suicide. Remarkably, Defendant Keaveny explicitly did not note any rationale for taking Ms. Archuleta off suicide watch.

56.    On May 26, 2022, at 6:22 p.m., Defendant Keaveny met with Ms. Archuleta as part of a follow-up to her being taken off suicide watch. Defendant Keaveny noted that Ms. Archuleta was emotionally drained and had a blunted affect. Ms. Archuleta told Defendant Keaveny that she was experiencing suicidal ideation and that she thought about killing herself on a daily basis. Ms. Archuleta also told Defendant Keaveny that she had recently attempted suicide. Defendant Keaveny noticed that Ms. Archuleta was visibly depressed. Again, Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file indicated that Defendant Keaveny was on notice, and put other Defendants on notice, that Ms. Archuleta was at significant risk of suicide. Despite his specific knowledge regarding Ms. Archuleta's suicidality, Defendant Keaveny did not refer Ms. Archuleta to a psychiatrist for further treatment or medication, but instead handed her a

pamphlet on depression. Likewise, Defendant Keaveny did not place Ms. Archuleta back on suicide watch.

57.     Within forty-eight hours, on May 27, 2022, Ms. Archuleta made statements about having suicidal ideation to an El Paso County deputy and said that she did not feel safe in a jumpsuit (versus clothing specifically designed so that it could not be used in a suicide attempt). After making those statements, Ms. Archuleta met with Mr. Carrington. After the meeting, Ms. Archuleta was again placed on suicide watch. Mr. Carrington noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at significant risk of suicide.

58.     On May 29, 2022, at approximately 4:04 p.m., Mr. Carrington met with Ms. Archuleta because she remained on suicide watch. Ms. Archuleta reported to Mr. Carrington that she had been sleeping a lot. Mr. Carrington noted that Ms. Archuleta had made multiple statements indicating suicidal ideation since arriving at the CJC, and that these statements required that she be placed on suicide watch. He noted that Ms. Archuleta was not being provided with mental health medications, even though she had been prescribed these medications while in the secure treatment facility earlier that year. Mr. Carrington noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at significant risk of suicide.

59.     On June 1, 2022, at approximately 1:00 p.m., Defendant Keaveny again took Ms. Archuleta off suicide watch despite Ms. Archuleta's known risk factors, the fact that she

expressed suicide ideation to him at that time, and her history of attempting suicide. As before, Defendant Keaveny did not provide a rationale for removing Ms. Archuleta from suicide watch.

60.    On June 2, 2022, Ms. Archuleta was involved in an altercation with another inmate. During that altercation, she was accused of assaulting the inmate and an El Paso County deputy. As a result of this incident, serious charges were brought against Ms. Archuleta that carried with them significant prison time, in addition to the prison time that Ms. Archuleta was already facing from her underlying charges.

61.    On June 3, 2022, at approximately 9:00 a.m., El Paso County Deputy L. Stengle discovered Ms. Archuleta in her cell, naked, with approximately thirty deep, fresh, and dark red two-inch cuts running down her right thigh and inner left thigh. When Deputy Stengle asked Ms. Archuleta what had happened, she told Deputy Stengle that she had taken a screw out of a light fixture in the ceiling and used it to harm herself. Ms. Archuleta then gave the screw to the Deputy Stengle and apologized. In response to this obviously disturbing behavior, Deputy Stengle called Defendant Keaveny to evaluate Ms. Archuleta.

62.    During their meeting, on June 3, 2022, at approximately 10:00 a.m., Ms. Archuleta told Defendant Keaveny that she had current suicidal ideation. Ms. Archuleta told Defendant Keaveny that she was having command auditory hallucinations—hallucinations that instruct someone to act a certain way, along with visual hallucinations, and that the voices in her head were telling her to hurt herself. Ms. Archuleta told Defendant Keaveny that when she listened to the voices, and hurt herself, it eased her guilt. Ms. Archuleta told Defendant Keaveny that she had a plan to commit suicide. Ms. Archuleta also told Defendant Keaveny that she was having nightmares.

63.     Again, Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file indicated that Defendant Keaveny was on notice, and put other Defendants on notice, that Ms. Archuleta was at significant risk of suicide.

64.     Ms. Archuleta asked Defendant Keaveny if she could be prescribed mental health medication for her depression, self-harming thoughts and actions, auditory command hallucinations, visual hallucinations, and suicidal ideation. Defendant Keaveny took no steps to assist Ms. Archuleta in getting her prescribed medications that she so desperately needed. Instead, he told Ms. Archuleta that he could not prescribe her medications and that the medication provider who could provide her with medications was impossible to reach on the phone, so it was not an option for Ms. Archuleta to receiver psychotropic medications while in the CJC. Instead of providing mental health treatment, Defendant Keaveny told Ms. Archuleta that she should simply find things to take her mind from her suicidal thoughts, like exercising. Defendant Keaveny took no action to prevent Ms. Archuleta from engaging in self-harming and suicidal behaviors. Defendant Keaveny never referred Ms. Archuleta to see a psychiatrist nor took any other actions to attempt to provide her obviously necessary medications.

65.     Defendant Keaveny did not place Ms. Archuleta on suicide watch on the morning of June 3, 2022, despite all of these obvious signs and symptoms, including her explicit statements, that she was likely to engage in additional self-harming and suicidal behavior. Instead, Defendant Keaveny simply noted all of this additional information regarding Ms. Archuleta's obvious and serious risk of suicide to her file and provided Ms. Archuleta with two pamphlets on anxiety and nightmares.

66.     At approximately 11:20 a.m. on June 3, 2022, Deputy Stengle returned to Ms. Archuleta's cell and observed her, naked, punching herself in the mouth. Ms. Archuleta was bleeding badly. Ms. Archuleta did not respond when Deputy Stengle told Ms. Archuleta to stop and instead, she continued punching herself in the mouth. Deputy Stengle called for other deputies to assist, and El Paso County Deputies Blake Imgrund and Trisha Mathill responded. The deputies entered the cell and placed Ms. Archuleta into a restraint chair.

67.     The deputies then told Defendant Keaveny about the incident. Despite the fact that Ms. Archuleta had engaged in serious self-harming activity for a second time in the same day, and presented with multiple indicators of severe suicide risk, Defendant Keaveny did not place Ms. Archuleta on suicide watch. Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing all Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. In addition to demonstrating Defendant Keaveny's own awareness of Ms. Archuleta's suicidality and desperate need for help, these notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at a high risk of suicide.

68.     Deputy Mathill noted in Ms. Archuleta's records how remarkable it was that Defendant Keaveny did not place Ms. Archuleta on suicide watch after what she had witnessed.

69.     After the two disturbing self-harm incidents on June 3, 2022, two of the El Paso County deputies who had witnessed Defendant Keaveny's conversations with Ms. Archuleta, Deputy Stengle and Deputy Mathill, were profoundly distressed by Defendant Keaveny's manifest indifference for Ms. Archuleta that Deputy Stengle. Because of how troubled Deputy Stengle was by the inadequate response by mental health providers and, particularly, Defendant Keaveny, she told Deputy Mathill to write a note in her report. In particular, she made sure to

24

state that Defendant Keaveny had not moved Ms. Archuleta to suicide watch despite the fact that Ms. Archuleta had made explicit statements to Defendant Keaveny that she had a plan to kill herself.

70.     On June 4, 2022, at approximately 6:08 p.m., Ms. Archuleta spoke with Mr. Carrington and told him that she was continuing to experience suicidal ideation and command auditory hallucinations, which told her to hit herself in the face or kill herself. Ms. Archuleta asked to be placed on suicide watch as she was continuing to have self-harming thoughts. Mr. Carrington observed that Ms. Archuleta was depressed and had a flat affect. Mr. Carrington noted that Ms. Archuleta's suicide risk was high. Mr. Carrington noted all of this information in Ms. Archuleta's file, providing all Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at a high risk of suicide. Mr. Carrington referred Ms. Archuleta to a psychiatrist. This was the first time that anyone referred Ms. Archuleta to a psychiatrist. Despite this referral, Defendants never actually allowed Ms. Archuleta to see a psychiatrist or receive medication during her incarceration at the CJC. Ms. Archuleta was also placed on suicide watch on June 4, 2022, but not by Defendant Keaveny.

71.     On June 5, 2022, Wellpath Licensed Professional Counselor Lori Seitz assessed Ms. Archuleta and noted that her current risk of suicide was high. Ms. Archuleta was experiencing auditory command hallucinations telling her to commit suicide and self-harm. Ms. Seitz noted all of this information in Ms. Archuleta's file, providing Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put Defendants on notice that Ms. Archuleta was at a high risk of suicide.

72.     On June 6, 2022, at approximately 12:24 p.m., Defendant Wesolowski met with

Ms. Archuleta who told her that she did not feel safe coming off suicide watch. When Ms.

Archuleta had made these statements previously, they had been considered statements of suicidal

ideation by Mr. Carrington. Defendant Wesolowski observed that Ms. Archuleta was depressed

and had a blunted affect. Defendant Wesolowski noted that Ms. Archuleta had thoughts of killing

herself and that she had taken actions to prepare to end her life. Defendant Wesolowski noted

that Ms. Archuleta continued to have risk factors for suicide, including that: she had prior suicide

attempts; she was impulsive; and she had engaged in non-suicidal self-injury. Defendant

Wesolowski assessed Ms. Archuleta's suicide risk at intermediate and kept Ms. Archuleta on

suicide watch. Defendant Wesolowski noted all of this information in Ms. Archuleta's file,

providing Defendants additional specific detailed information regarding Ms. Archuleta's

multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file put

Defendants on notice that Ms. Archuleta was at significant risk of suicide.

73.     On June 8, 2022, around approximately 10:44 a.m., Defendant Wesolowski met

with Ms. Archuleta. Defendant Wesolowski noted a new risk factor for suicide that Ms.

Archuleta was experiencing: a heightened preoccupation with her legal issues, including new

charges that carried with them a lengthy sentence and the potential for denial of parole and

probation. Defendant Wesolowski noted all of this information in Ms. Archuleta's file, providing

all Defendants additional specific detailed information regarding Ms. Archuleta's new risk factor

for suicide. These notations in Ms. Archuleta's file indicated that Defendant Wesolowski was on

notice, and put other Defendants on notice, that Ms. Archuleta was at significant risk of suicide.

74.     Despite it being clear that Ms. Archuleta continued to have suicidal ideation,

Defendant Wesolowski took Ms. Archuleta off suicide watch on June 8, 2022. The only reason

given for taking Ms. Archuleta off suicide watch was that she had been "bopping back and forth" between being on suicide watch and being off suicide watch. This was an improper and unjustified basis for taking Ms. Archuleta off suicide watch, and Ms. Archuleta obviously remained at serious risk of suicide at the time.

75.    On June 9, 2022, at approximately 2:56 p.m., Defendant Keaveny spoke with Ms. Archuleta to evaluate whether she should remain off suicide watch, which meant she would be single-celled—that is, housed in a cell by herself. He noticed that she had a blunted affect and was not smiling, Ms. Archuleta specifically told Defendant Keaveny that she was experiencing constant suicidal ideation. Ms. Archuleta also told Defendant Keaveny that she continued to have visual and auditory hallucinations. Again, Defendant Keaveny noted all of this information in Ms. Archuleta's file, providing all Defendants additional specific detailed information regarding Ms. Archuleta's multiple and serious risk factors for suicide. These notations in Ms. Archuleta's file indicated that Defendant Keaveny was on notice, and put other Defendants on notice, that Ms. Archuleta was at significant risk of suicide.

76.    Despite Ms. Archuleta's obvious and serious risk of suicide, Defendant Keaveny did nothing to ensure that she saw the psychiatrist, receive treatment such as medication, was placed on suicide watch or into a safer double cell, or anything else to protect her from harm. Rather, Defendant Keaveny callously told Ms. Archuleta to simply use her coping skills and handed her a booklet on anxiety. Notably, Defendant Keaveny did not complete a Suicide Watch Daily Follow-up and Discharge for Mental Health evaluation when he met with Ms. Archuleta. This violated standard practices for mental health clinicians when evaluating someone like Ms. Archuleta who was coming off suicide watch and had a history of suicide risk.

27

77.    Ms. Archuleta met with her criminal defense attorney on June 9, 2022, before meeting with Defendant Keaveny, and learned that she was facing significant time in prison. Despite knowing that she had met with her attorney and faced serious charges for allegedly assaulting another inmate and a deputy, Defendant Keaveny did not take this into account when he evaluated Ms. Archuleta for suicide risk, even though he knew that it was a risk factor.

78.    Defendant Wesolowski and Defendant Keaveny both decided to take Ms. Archuleta off suicide watch despite knowing that Ms. Archuleta presented with the following risk factors that would have made it obvious to any mental health provider that she had a serious and substantial risk of suicide: a recent history of self-harm and suicide attempts; a history of taking anti-depressants (which Defendants were not providing to Ms. Archuleta at the CJC despite her request to be placed on medication); a history of prior placement on suicide watch while Ms. Archuleta was in youth detention; a history of substance abuse; recent changes in her legal status, including that she was facing serious criminal charges that were likely to result in Ms. Archuleta spending time in prison; recent and consistent expressions of suicidal ideation; recent suicidal ideation with a plan and preparation for committing suicide; recent command auditory hallucinations to commit suicide; a childhood history of trauma and abuse; a family history of suicide attempts; a history of domestic abuse; a recent history of giving items away to others; recent feelings of hopelessness, worthlessness, guilt, and agitation; recent wishes to be dead; placement in isolation; recent active major depression, mania, auditory hallucinations, and delusions; severe anxiety; flashbacks; her young age; a blunted affect; recent high risk of suicide; two documented incidence of being found naked in her cell and engaging in self-harm; and she was recently observed as acting impulsive. Despite knowing about all of these risk factors,

Defendant Wesolowski and Defendant Keaveny consciously and unjustifiably decided to remove Ms. Archuleta from suicide watch.

79.     Defendants Keaveny and Defendant Wesolowski consciously decided to remove Ms. Archuleta from suicide watch knowing that doing so would necessarily place her into a single cell. Obviously, placing Ms. Archuleta into a single cell without the monitoring provided by suicide watch was dangerous because it allowed her to be unobserved by anyone for long periods of time. If Ms. Archuleta had a cellmate, some risk of suicide might have been ameliorated because her cellmate could report any suicide attempts by Ms. Archuleta. Defendant Keaveny and Defendant Wesolowski knew of, and understood, this danger, yet still decided to take Ms. Archuleta off suicide watch and place her into a single cell.

80.     In addition to their direct and specific knowledge of Ms. Archuleta's many serious indicators of a high risk of suicide from their own communications with Ms. Archuleta, Defendant Keaveny and Defendant Wesolowski also had access to all Ms. Archuleta's medical records from within the CJC. They should have reviewed these records each time they spoke with Ms. Archuleta and, therefore, should have known about Ms. Archuleta's extensive history of suicidal ideation, command auditory hallucinations, self-harming behavior, and other obvious signs of suicidality that she had displayed over the months of May and June in the CJC.

81.     Despite this knowledge, Defendant Keaveny and Defendant Wesolowski made the conscious decision to take Ms. Archuleta off suicide watch knowing that this would place her into a single cell where she would not be subject to observation by a cellmate or regular monitoring.

82.     Defendant Keaveny and Defendant Wesolowski also knew that removing Ms. Archuleta from suicide watch meant she would no longer be clothed in a "turtle suit," which was

clothing designed to prevent its use in suicide attempts, and, instead, that she would be dressed in normal inmate attire that posed a risk for its potential to be used in suicide attempts.

83.    Wellpath claims to utilize the Columbia Suicide Severity Rating Scale in assessing the suicidality of inmates. Yet Wellpath does not adequately train its officials on this important tool. Moreover, Wellpath mental health officials do not customarily follow the Columbia Suicide Severity Rating Scale, as evidenced by the decision to take Ms. Archuleta off suicide watch. Based on her score under the factors in the Columbia Suicide Severity Rating Scale, Ms. Archuleta should have remained on suicide watch throughout her incarceration.

84.    Less than two hours after meeting with Defendant Keaveny on June 9, 2022, a meeting during which she expressed suicidal ideation, Ms. Archuleta committed suicide by hanging at approximately 4:15 p.m. The deputy who was assigned to perform checks on Ms. Archuleta, Deputy Fodera, told investigators after her death that it was obvious that Ms. Archuleta continued to be suicidal and should have remained on suicide watch. It was obvious even to him, as a layperson, that Ms. Archuleta posed a serious risk of suicide to the extent that she should have been confined in a suicide watch cell.

85.    Ms. Archuleta used a piece of her jumpsuit, attached to the metal grating in her cell, to hang herself. It was well known within the CJC that the metal grating posed a risk for inmates to hang themselves. Defendant Christine Mohr knew about this risk and even had conversations with El Paso County officials about the risk the grating posed to inmates, but Defendant Mohr did nothing but did nothing to ensure that the grating was fixed. Had Defendant Mohr, or any other Wellpath official, addressed the obvious risk that the metal grating posed, Ms. Archuleta would likely be alive today.

86.     As a clinical psychologist who oversaw all psychiatric care at the CJC, Defendant
Mohr oversaw all of Mr. Archuleta's mental health care throughout her incarceration.
Throughout Ms. Archuleta's incarceration, Defendant Mohr was aware of Ms. Archuleta's
obvious risk of self-harm and suicide based on her consistently being on suicide watch and the
notes in Ms. Archuleta's file which made it obvious that she was continuously suicidal.

87.     During Ms. Archuleta's incarceration at the CJC, mental health staff under
Defendant Mohr's supervision noted in Ms. Archuleta's file that Ms. Archuleta presented with
the following risk factors that would have made it obvious to any mental health provider that she
had a serious and substantial risk of suicide: a recent history of self-harm and suicide attempts; a
history of taking anti-depressants (which Wellpath did not provide to Ms. Archuleta at the CJC
despite her repeated requests to be placed on medication); a history of prior placement on suicide
watch while Ms. Archuleta was in youth detention; a history of substance abuse; recent changes
in her legal status, including that she was facing serious criminal charges that were likely to
result in Ms. Archuleta spending time in prison; recent and consistent expressions of suicidal
ideation; recent suicidal ideation with a plan and preparation for committing suicide; recent
command auditory hallucinations to commit suicide; a childhood history of trauma and abuse; a
family history of suicide attempts; a history of domestic abuse; a recent history of giving items
away to others; recent feelings of hopelessness, worthlessness, guilt, and agitation; recent wishes
to be dead; placement in isolation; recent active major depression, mania, auditory
hallucinations, and delusions; severe anxiety; flashbacks; her young age; a blunted affect; recent
high risk of suicide; two documented incidence of being found naked in her cell and engaging in
self-harm; and observations of her as acting impulsive.

88.     Despite being aware of these many substantial risks and having the authority to intervene so that Ms. Archuleta remained on suicide watch and received the psychiatric care she so obviously needed, Defendant Mohr took no action to do so. Defendant Mohr failed to ensure that Ms. Archuleta remained on suicide watch, had a consultation and/or treatment from a psychiatrist, was provided a consultation and/or treatment from a psychologist, or was given psychotropic medication. Defendant Mohr made the intentional decision to provide Ms. Archuleta with no care whatsoever. Defendant Mohr took no action to prevent Ms. Archuleta from being housed in a cell with a known suicide risk.

**It was obvious to even deputies and other inmates that Ms. Archuleta was at serious and substantial risk of suicide and should have remained on suicide watch.**

89.     Given all of the indications Ms. Archuleta displayed during her incarceration showing that she was at serious and substantial risk of suicide, Ms. Archuleta's suicidality was so obvious that even a lay person would recognize that she needed to remain on suicide watch and needed immediate psychiatric care.

90.     Deputy Fodera stated in an interview after Ms. Archuleta's death that he did not understand how Ms. Archuleta was not on suicide watch. It was obvious to Deputy Fodera that Ms. Archuleta should never have been removed from suicide watch before her death due, in part, to all her scars and self-injuries while she was incarcerated.

91.     Another inmate, Heaven Taylor, who was housed two cells down from Ms. Archuleta when she died, also observed that it was obvious that Ms. Archuleta was suicidal and should have been on suicide watch. Ms. Taylor observed that Wellpath officials knew that Ms. Archuleta was suicidal every day she was in the CJC and in fact was one of the suicidal inmates at the greatest risk of suicide at the CJC. Before she died, staff at the CJC constantly talked about how suicidal Ms. Archuleta was.

**Defendants abjectly failed to obtain records that would have made them even more aware of Ms. Archuleta's obvious and well-document mental health needs.**

92.    Ms. Archuleta had a well-documented history of mental health issues, including major depressive disorder with anxious distress and post-traumatic stress disorder. She was also diagnosed with conduct disorder. These diagnoses occurred while she was institutionalized in a state-run secure treatment facility from June of 2021 through March of 2022. Wellpath officials knew that Ms. Archuleta was institutionalized in the state-run secure treatment facility and should have obtained Ms. Archuleta's medical records from her time in the state-run secure treatment facility. Had they obtained these records they would have had further evidence of Ms. Archuleta's well-documented history of mental health issues. Their failure to obtain these records demonstrates their deliberate indifference to her known, obvious, and serious mental health needs.

93.    In approximately 2018, Ms. Archuleta attempted suicide by taking an overdose of antidepressant medication, which was documented in her medical records from the secure treatment facility that she was institutionalized in.

94.    In 2020, while Ms. Archuleta was in secure treatment facility, she attempted suicide by hanging herself.

95.    Ms. Archuleta reported having auditory hallucinations while in the secure treatment facility. She also reported having suicidal ideations.

96.    While in the secure treatment facility, she was on a regimen of antidepressants and was regularly treated by mental health personnel, including a psychiatrist. Ms. Archuleta had weekly meetings with mental health clinicians. Ms. Archuleta was prescribed Lexapro (Escitalopram Oxalate), which is a type of antidepressant classified as a Selective Serotonin Reuptake Inhibitor.

97.     While in the secure treatment facility, Ms. Archuleta engaged in regular self-harming behavior, including hitting and cutting herself.

98.     While in the secure treatment facility, Ms. Archuleta made multiple attempts at suicide. During one instance, Ms. Archuleta wrapped a sheet around her neck. In another instance, Ms. Archuleta tied a headphone cord around her neck. At one point, Ms. Archuleta was also hoarding medication so that she could purposefully overdose.

99.     When Ms. Archuleta was at the secure treatment facility, she was being monitored with four-minute checks by officials at the facility under suicide prevention monitoring because of her serious mental health issues and history of suicide attempts. Ms. Archuleta was on suicide monitoring at the secure treatment facility until at least the end of April 2022.

100.    Based on the records from the secure treatment facility, Wellpath officials should have known that she had: (1) a history of suicidal ideation and attempts, along with self-harming behavior, (2) diagnoses of major depressive disorder with anxious distress and post-traumatic stress disorder, (3) been prescribed medication to treat her major depressive disorder with anxious distress and post-traumatic stress disorder. Wellpath officials' failure to obtain these records was deliberately indifferent given what they knew about Ms. Archuleta's history of mental health needs.

**Wellpath officials affirmed that every action taken with respect to Ms. Archuleta was in compliance with Wellpath's policy, custom, and practice.**

101.    After Ms. Archuleta committed suicide, El Paso County conducted interviews with Defendant Keaveny, Defendant Wesolowski, Defendant Mohr, and others involved with Ms. Archuleta's care (or lack thereof).

102.    During Defendant Wesolowski's interview after Ms. Archuleta's death, she unambiguously testified that every action she took was in accordance with Wellpath's policies and procedures.

103.    Upon information and belief, Wellpath did not discipline anyone regarding Ms. Archuleta's treatment (or lack thereof) during her incarceration and/or her suicide.

**Defendants Wellpath and Mohr failed to adequately train Wellpath's officials.**

104.    Defendant Wellpath and Defendant Mohr failed to adequately train the mental health staff on the Columbia Suicide Severity Rating Scale, the risk factors relating to suicide, the requirement that inmates be provided access to previously prescribed critical psychotropic medications, the requirement that a psychiatrist evaluate any inmate before taking them off suicide watch, and the necessity of referring inmates who present with suicidal risk factors (including the risk factors presented by Ms. Archuleta) to a psychiatrist.

105.    Defendant Wellpath and Defendant Mohr failed to adequately train and supervise their mental health staff in such a way that it amounted to deliberate indifference to the serious mental health needs of inmates presenting with suicidal ideation, including Ms. Archuleta.

106.    Wellpath was deliberately indifferent to its patients' needs by training its officials are to disregard symptoms of suicidality. Wellpath officials are trained to not elevate, or not timely elevate, inmates with obvious risk factors for suicide like those experienced by Ms. Archuleta, to a psychiatrist for evaluation and treatment.

107.    The need for such training and the probability that the failure to provide such training would cause an inmate like Ms. Archuleta to die by suicide was so obvious that Defendant Wellpath's and Defendant Mohr's failure to do so constituted deliberate indifference to Ms. Archuleta's serious medical needs.

108.    Finanal considerations were a motivating factor in Defendants' decision to move Ms. Archuleta off of suicide watch, Defendants' failure to provide her with her psychotropic medication, and Defendants' refusal to have her evaluated by a psychiatrist.

109.    Pursuant to their training by Wellpath, low-level mental health officials are encouraged to practice outside their scope, not call higher-level providers when such a call is required, and make their own determinations about the cause and veracity of an inmates' serious mental health needs, instead of calling the psychiatrist.

110.    Customarily, within the CJC, it was unreasonably extremely easy for Wellpath personnel to remove an inmate from suicide watch. It often took only a day for Wellpath to remove an inmate from suicide watch, and Wellpath's decision to remove inmates from suicide watch in the CJC customarily was not based on objective clinical indicators regarding an inmate's risk of suicide.

**Wellpath's customs and practices were deliberately indifferent to inmate's mental health needs and caused the violation of Ms. Archuleta's constitutional rights and her death.**

111.    Wellpath's post-intake mental health assessments are woefully inadequate, and customarily occur after significant delay. The quality of the mental health assessments is customarily inconsistent, with some clinicians failing to capture information relevant to treatment planning and suicide risk assessment. The mental health assessments customarily fail to note diagnoses in the electronic health record or provide a rationale for creating certain mental health alerts, thus impeding other clinicians from providing informed, appropriate follow-up treatment. In addition, clinicians conducting the assessments customarily fail to make referrals for appropriate follow-up care, including for inmates who require psychiatric evaluations.

112.    Wellpath fails to provide adequate treatment plans for prisoners with mental health needs. Treatment plans should include prisoners' diagnoses, suicide risk and protective factors, treatment goals, treatment interventions including therapy or psychiatric care, and any other specialized needs that affect mental health. Wellpath does not provide centralized treatment plans for most prisoners with mental illness, even those with serious mental illness. The failure to provide adequate, centralized treatment plans that provide clarity with respect to basics such as diagnoses leads to inappropriate treatment and places inmates at risk of suicide.

113.    Wellpath customarily fails to provide psychotropic medications to inmates with serious mental illness. It customarily does not provide initial psychiatric evaluations at the CJC even for inmates that require them. Inmates with serious mental illness are customarily not appropriately expedited for urgent or emergent referrals.

114.    Wellpath's suicide prevention procedures suffer from serious deficiencies, which customarily cause harm and the substantial risk of serious harm.

115.    Wellpath customarily does not systemically to track, aggregate, or analyze the number of suicide threats or self-inflicted injury incidents. Wellpath customarily does not require debriefings after suicide attempts.

116.    Although Wellpath has a form to measure suicide risk for inmates, the form is customarily regularly disregarded, and the quality of the assessment is customarily cursory. Wellpath customarily allows lower-level providers, including Licensed Marriage and Family Therapists, to make the decision to remove an inmate from suicide watch without consulting a psychiatrist. When inmates are released from suicide watch, the follow-up assessments are customarily conducted by lower-level providers, like Licensed Marriage and Family Therapists, who customarily do not conduct structured suicide risk assessments. Because of this, inmates

with an ongoing risk of suicide, like Ms. Archuleta, are routinely released from suicide watch and remain off of suicide watch despite an obvious ongoing risk of suicide.

117.    An adequate suicide prevention program should regularly assess suicide risk and provide meaningful, ongoing therapeutic support. The above-described customary failures in suicide risk assessment, follow-up, monitoring, and treatment resulted in deficient medical care for inmates at the CJC, including Ms. Archuleta.

118.    These customs were widespread at Wellpath, both at the CJC and other facilities where Wellpath was the mental healthcare provider, as outlined below.

**Wellpath deliberately severely understaffed the CJC causing the violation of Ms. Archuleta's constitutional rights.**

119.    During the time of and leading up to Ms. Archuleta's death, it was well known by Defendant Wellpath and Defendant Mohr that there were serious staffing issues that caused a pattern and practice of deliberately indifferent mental health care in the CJC, which included: not having inmates evaluated by higher level mental health care providers, even when necessary to prevent serious injury or death; failing to prescribe, or continue providing, critical psychotropic medications; removing inmates from suicide watch due to staffing shortages; and removing inmates from suicide watch to reduce financial costs.

120.    These patterns and practices compelled the involved Wellpath officials to remove Ms. Archuleta from suicide watch, practice outside their scope by making decisions to remove Ms. Archuleta from suicide watch, fail to elevate Ms. Archuleta's obvious mental health needs to an appropriate provider, and fail to provide Ms. Archuleta with critical psychotropic medications.

121.    Defendant Wellpath and Defendant Mohr adopted deliberately indifferent policies regarding the staffing of the CJC with psychiatrists, including a staffing plan that did not require

higher level mental health providers to evaluate inmates before removing them from suicide watch and did not provide inmates their critical psychotropic medications.

122.    Wellpath contracts with El Paso County to provide psychiatric care, as well as to provide protocols and training related to such protocols to nurses, including on when to contact on-call psychiatrists.

123.    When forming that contract, the request for proposal for medical and mental health care at the CJC required that the medical care provider fill all positions and, if not, the medical and mental health care provider would face a fine of $100 per day. In response to the request for proposal, Wellpath explicitly requested that this requirement be dropped with respect to the positions of psychiatrist and psychiatric mid-level because of its intention to purposefully understaff the CJC. This change caused Ms. Archuleta's death. Wellpath failed to allow Ms. Archuleta to see a psychiatrist and/or psychiatric mid-level provider during the entirety of her stay at the CJC despite it being obvious that she needed this level of care, and the fact that she requested to speak to this level of provider. That was because Wellpath purposefully did not staff a psychiatrist or psychiatric mid-level provider at the CJC with appropriate availability to serve the population of inmates with mental health needs. Further, Defendants took Ms. Archuleta off suicide watch without approval from a psychiatrist. Wellpath provided no access to such a provider at the CJC because Wellpath did not staff a psychiatrist and/or psychiatric mid-level provider.

124.    Wellpath economically benefited from its decision not to staff a psychiatrist and/or psychiatric mid-level provider at the CJC. Pursuant to its contract with El Paso County, Wellpath was paid the same regardless of whether or not it staffed the CJC with a psychiatrist

and/or psychiatric mid-level provider, so it saved money by making the intentional decision not to do so. This perverse economic incentive caused Ms. Archuleta's death.

125.     Defendant Wellpath and Defendant Mohr knew that Jail inmates would require psychiatric care. During the year of 2019, the year before Wellpath took over the contract to provide medical and mental health care at the CJC, the average number of inmates on psychotropic medication monthly in the CJC was 394. During that calendar year, there were 2,564 inmates who were seen by a psychiatrist.

126.     Within the CJC, there were 14 suicide attempts in 2017, 19 suicide attempts in 2018, and 13 suicide attempts in 2019. In 2019, four inmates died by suicide. In 2018, two inmates died by suicide. In 2017, three inmates died by suicide.

127.     As of October 21, 2019, there were 1,749 inmates housed in the CJC. This number fluctuates somewhat, but there are generally more than 1,500 inmates within the CJC at any given time.

128.     Despite the well-known extensive mental health needs of the CJC population, Wellpath only provided that a psychiatrist be on duty for eight hours per week and did not set any requirements for a psychiatric nurse practitioner with prescriptive authority. There were, at most, eight required hours per week that a medical professional who could prescribe psychotropic medication was to be on duty at the CJC. Wellpath provided this patently inadequate mental health staffing despite its own conclusion that 40 hours of psychiatrist time is required for every 1,000 inmates that seek psychiatric care.

129.     When Ms. Archuleta asked to speak to a psychiatrist to inquire about receiving psychotropic medication, Wellpath Defendants responded that she could not see a psychiatrist during her incarceration because it was impossible to get one on the phone. Because of this,

Wellpath denied Ms. Archuleta her psychotropic medication during the entirety of her detention in the CJC despite it being obvious that she required it. Similarly, Wellpath never allowed Ms. Archuleta to be evaluated by a psychiatrist when making the multiple decisions to remove her from suicide watch, including the decision that ultimately caused her death.

130.    Under the terms of the contract between El Paso County and Wellpath, inmates on suicide watch shall only be released to general population upon approval of a licensed psychiatrist or medical doctor of psychiatry. Wellpath was purposefully not following this aspect of the contract due to its intentional decision to provide insufficient staffing in furtherance of its bare desire for more profit. It was widely known within the CJC that psychiatric care was unavailable and that the psychiatric care provider was unavailable. Wellpath's decision caused Ms. Archuleta's multiple self-injuries during her incarceration and, ultimately, her death by suicide in the CJC. Had Wellpath provided a psychiatrist to evaluate Ms. Archuleta, she almost certainly would have remained on suicide watch given her obvious risk factors. Instead, Wellpath required that Ms. Archuleta be evaluated by unqualified individuals (including a marriage and family counselor) who took her off suicide watch.

131.    Wellpath's failure to ensure adequate staffing caused Ms. Archuleta's death.

132.    As an example of the understaffing at the CJC, Wellpath so severely understaffed the CJC that often there were not even enough medical and mental health clinicians available to pass medications to every inmate who needed them. This failure was well documented:

| 03-06-2022 2:45 pm | Other | medication was not given due to critical staffing, only having one person to pass meds for the entire jail. | Payne, Nathan |
|---|---|---|---|

133.    Wellpath severely understaffed the CJC with mental health clinicians and providers. It was very difficult to receive mental health treatment in the CJC. Wellpath denied Ms.

Archuleta the necessary mental health treatment while in the CJC. The only contact that Ms. Archuleta had with mental health clinicians was during suicide checks when she was on suicide watch. Further, Wellpath's failure to provide an on-call psychiatrist who could consult with inmates caused her death. Wellpath's denial of Ms. Archuleta's ability to speak with a psychiatrist or access critical medication was the driving force in her multiple instances of self-harm and ultimate suicide. Lower-level clinicians, like Licensed Marriage and Family counselors, were practicing outside of their scope of practice because of Wellpath's understaffing. These providers placed individuals on suicide watch and removed individuals from suicide watch without consultation with psychiatrists, which was outside of their scope of practice. Further, mental health providers customarily provided inadequate mental health assessments, including assessments of suicide risk, in part because of the understaffing at the CJC. Mental health providers also customarily failed to make referrals for appropriate follow-up care because of the understaffing at the CJC. Wellpath routinely does not provide any psychiatrict evaluation to inmates because it does not staff a psychiatric provider. Wellpath's customary understaffing of mental health clinicians and providers caused Ms. Archuleta's death, as it failed to provided her the care and medication she required.

134.    Defendant Mohr knew that Wellpath unjustifiably failed to provide adequate mental health services at CJC, including the provision of timely psychiatric services and psychotropic medications as well as the appropriate placement on suicide watch of individuals at substantial and serious risk of suicide like Ms. Archuleta. Despite this knowledge, Defendant Mohr willfully or recklessly disregarded the obvious and known risk to inmates' safety in not ameliorating such risk by addressing any of the risk factors alleged above.

### H.I.G. Capital owns and controls Wellpath, Correct Care Solutions, Correctional Healthcare Companies, and California Forensic Medical Group.

42

135.     At all relevant times, Wellpath was and is owned and controlled by H.I.G. Capital. Wellpath acts on behalf of H.I.G. Capital and H.I.G. Capital was and is responsible for the hiring, retaining, training, and supervising of the conduct, policies and practices of its employees and agents of Wellpath, including Defendants Wesolowski, Keaveny, and Mohr.

136.     H.I.G. Capital acquired California Forensic Medical Group ("CFMG") in 2013 and rebranded its name to Correctional Medical Group Companies ("CMGC") that same year. H.I.G. Capital is the owner, manager and partner of California Forensic Medical Group ("CFMG") – now CMGC, which contracts to provide delivery of medical services to prisoners and was and is responsible for the management, hiring, retaining, training, and supervising of the conduct, policies and practices, customs, standards, finances, of its employees, managers, supervisors, contractors, leaders in the service of providing medical care to prisoners, including Ms. Archuleta.

137.     On October 1, 2018, H.I.G. Capital announced that it had acquired CCS and merged it with CMGC. Previously, CCS had merged with Correctional Healthcare Companies ("CHC").

138.     H.I.G. Capital renamed CCS and CFMG "Wellpath" in October 2018, for the purpose of carrying H.I.G. Capital's ownership and financial interests in providing jail mental and medical health care and so H.I.G. Capital controls the assets and financial gains while CFMG and Wellpath assume the liabilities.

139.     Wellpath is estimated to generate $1.5 billion annually.

140.     On October 1, 2018, H.I.G. Capital publicly announced that "[o]ver the years, as the country's health care system has changed; we have seen more and more individuals with

acute mental health diagnosis and substance use disorders being treated by our doctors, nurses and clinicians in correctional settings."

141.    In an October 1, 2018, press release, a Managing Director of H.I.G. Capital, Mr. Wolfson, announced, "We are proud of what we have accomplished since partnering with CMGC in 2012, and excited to bring these two companies together." Mr. Wolfson further affirmatively stated, "[H.I.G. Capital] believe[s] we have combined the industry's two best management teams."

142.    H.I.G. Capital knew that the provision of behavioral and mental healthcare to individuals housed in local, state, and federal correctional facilities or civil commitment centers was a booming business, as such facilities have become repositories particularly for the vulnerable mentally ill population growing across the United States. H.I.G. Capital decided to capitalize on this vulnerable population.

143.    H.I.G. Capital uses the corporate entity as a shield against liability and harm caused to the mentally ill in jails and prisons.

144.    Treating H.I.G. Capital as a separate corporate entity that is not responsible for the acts of the various corporations under its ownership and control would promote injustice and defeat the rights and equities of persons such as Ms. Archuleta and Plaintiffs; it would enable and facilitate continuation of Wellpath's and H.I.G. Capital's unconstitutional conduct, practices, customs and policies, actions and inactions that harm this particularly vulnerable jail population and discourage abatement of these unconstitutional actions and inactions.

145.    Kip Hallman is President of Wellpath, which has merged CMGC (who owns CFMG) and CCS (known as CCS-CMGC). All of these companies are under the ownership, supervision, management, and direction of H.I.G. Capital. Mr. Hallman has the duty and

responsibility for managing and overseeing all Wellpath medical delivery operations, including those at the CJC. Mr. Hallman is and was responsible for promulgation of policies, procedures and allowance of the practices/customs pursuant to which the acts of H.I.G. Capital, Wellpath, and its employees and agents.

146.    The contract between El Paso County and Wellpath was signed by Mr. Hallman.

147.    H.I.G. Capital exercises sufficient control over Wellpath's activities such that Wellpath is a mere agent or instrumentality of H.I.G. Capital.

148.    H.I.G. Capital places its senior partner and/or members on the boards or managing bodies of Wellpath in order to maintain a high degree of day-to-day control over Wellpath's activities. H.I.G. Capital has seats on the board of Wellpath and controls, manages, and approves major policy decisions of Wellpath. On Wellpath's website, it explicitly admits that H.I.G. Capital members are on Wellpath's Board of Directors.

149.    H.I.G. Capital acts through its employees, agents, directors, officers and is responsible for the acts of its employees, agents, directors, and officers performed within the scope of such agency. Defendants Wellpath, Wesolowski, Keaveny, and Mohr were acting on behalf of H.I.G. Capital (and Wellpath) and were and are agents of H.I.G. Capital, and therefore H.I.G. Capital (in addition to Wellpath) is responsible for their conduct as described in this complaint.

150.    Wellpath undertakes the provision of jail medical and mental health services with the understanding that H.I.G. Capital is the principal in control of those activities. H.I.G. Capital has authorized and in fact encouraged Wellpath to conduct those activities in a manner that contains costs and jeopardizes the lives of individuals who have mental illnesses, and H.I.G. Capital has or should have knowledge of all material facts about Wellpath's actions.

151. H.I.G. Capital ratifies Wellpath's conduct by knowingly accepting the risks associated with contracting for the provision of jail medical services and mental health services. Despite knowledge of the unconstitutional actions and inactions causing harm to Colorado's sick and mentally ill inmates, Wellpath is H.I.G. Capital's twenty-third control investment in healthcare since 2008 and is its fourteenth current platform in the sector.

**Wellpath has a longstanding history of providing deliberately indifferent care.**

152. At the time of the events alleged herein, Wellpath was a national company with a disgraceful history of failing to provide constitutionally adequate medical care to inmates. Amid a focus on cost containment and massive corporate growth, the company has provided substandard mental health and medical care that has caused avoidable deaths and other serious negative outcomes. An abundance of examples in Colorado and nationwide establish that Wellpath, and its predecessor companies, are deliberately indifferent in their policies, customs, and practices to the mental health needs, medical needs, and constitutional rights of inmates.

153. Wellpath previously operated in Colorado and nationwide as CCS. In the request for proposal submitted by Wellpath for the contract at the CJC, Wellpath admitted that it previously had done business as CCS. Prior to operating in Colorado and nationwide as CCS, Wellpath operated as CHC. CFMG also became part of Wellpath when it was formed. The re-branding to Wellpath was undertaken to escape the names associated with these companies that have a long, sordid history of providing constitutionally deficient care to inmates – but the company's deficient care remains the same, no matter how many times the name is changed.

154. Wellpath and its merged companies repeatedly relied on inexperienced workers, offered minimal training, and understaffed facilities. Across the country, clinicians acting on behalf of Wellpath have consistently failed to diagnose and monitor life-threatening illnesses and

46

chronic diseases, denied urgent transfers to higher-level care, and failed to diagnose or treat serious psychiatric disorders. Wellpath consistently allows common conditions in jails to become fatal.

155.    Wellpath's founder and CEO of its predecessor company CCS, Gerard Francis "Jerry" Boyle, pleaded guilty in 2021 to federal bribery charges after he bribed a Norfolk County Sheriff in a pay-to-play scheme. Yet as recently as May 2019, Wellpath called Boyle a "visionary" founder, noting that the company had "adopted his management philosophy as our company's values."

### **Wellpath has been found liable for providing customary deliberately indifferent mental health care by multiple governmental entities, experts, and former employees.**

156.    Various governmental institutions have repeatedly made extensive reports of constitutional deficiencies in the care provided by Wellpath and Wellpath-predecessor companies. A number of these reports noted chronic understaffing by Wellpath and Wellpath-predecessor companies. The policies, customs, and practices, along with the lack of training and staffing, that led to the issuance of the below-outlined reports are the exact same as those that caused Ms. Archuleta's death at the CJC.

157.    Wellpath-predecessor CFMG also had a long history of providing deliberately indifferent care. Over a 10-year period ending in 2014, people in custody at California county jails serviced by CFMG died of suicide or drug overdose at a rate about 50 percent higher than at other county jails when adjusted for population, and a total of 92 people died of suicide or a drug overdose. CFMG's contracts created an incentive to limit costs because the county paid CFMG a set amount, regardless of how many doctor visits or prescriptions were needed. At one point, company co-founder Dr. Taylor Fithian wrote a letter to one of his employees expressing

concern that inmates were making too many emergency room visits and hospitalizations. About 20 percent of the inmates in jails where CFMG provided care were identified as having mental health needs in 2013. Yet the company contracted to have a psychiatrist on site no more than nine hours a week, with an average of less than five minutes of in-person psychiatric care each week, in the jails. The abject lack of mental health care provided by Wellpath-predecessor CFMG led to true deliberate indifference to inmates' mental health needs.

158.    In one example, an expert examined the Monterey County jail where CFMG provided care and reviewed three suicides there. In each case, he found that problems with CFMG's mental health and suicide prevention programs appeared to have contributed to the suicides. CFMG failed to provide inmates medicine or psychiatric consultation prior to their deaths. In another example, in Ventura County Jail, an inmate had a history of mental illness severe enough that he was once ruled incompetent to stand trial and a CFMG psychiatrist and other employees were aware of his condition. A federal judge found that the CFMG officials were responsible for the inmate "receiving no treatment for his mental health condition in the three months prior to his suicide and grossly insufficient monitoring, and thereby contributed to his death." The inmate committed suicide in 2009 and his lawsuit related to the deficient care provided by CFMG settled for $775,000.

159.    At the Pierce County Jail in Washington state, where ConMed (another predecessor company to Wellpath and CCS) was contracted to provide medical and mental health care, county officials found that the medical unit was chronically understaffed. The doctor could rarely be reached on the phone in a timely manner, if at all, at the facility. Within the first couple of months of the county's 2014 contract with ConMed, officials began to catalogue serious issues with the lack of care, including inmates frequently going without vital medication,

employees being escorted out of the jail after county officials discovered they weren't licensed to practice in the state, some of the medical unit's written policies appeared to have been copied and pasted from another facility (one page directed employees to report cases of sexual assault by calling an emergency room 1,500 miles away in Minnehaha County, South Dakota), and inmate requests were found stuffed in a drawer in a completely different part of the jail -- nowhere near the main clinic, where they should have been filed. After more than a year, Pierce County ultimately withheld four months of payments, amounting to nearly $1.5 million. When the county determined that CCS hadn't resolved the issues it cited, officials terminated the contract -- later calling the company's performance morally reprehensible. CCS sued Pierce County in an attempt to get paid, alleging the agency was in breach of contract. The county countersued, saying it hadn't received the services it had been promised. In its legal response, CCS denied the allegations. A jury ruled in Pierce County's favor in March of 2019, with the county receiving a final judgment of nearly $2 million (including interest).

160.    In a 2015 federal contract audit of the Reeves County Detention Center in Texas, where one of Wellpath's predecessors was contracted, the DOJ found there may have been a "potential financial incentive" for the company to leave positions vacant—as it did in 34 months of a 37-month period—because it was paid more for the required positions than it was forced to pay back for each one it left unfilled.

161.    An official with the Texas Civil Commitment Office wrote in 2016 that the agency was extremely concerned with the lack of treatment being provided by CCS at a state facility. CCS was ultimately hit with $1.1 million in financial penalties during its roughly four-year contract, for citations ranging from the hiring of unqualified mental health therapists to allowing referrals for offsite visits to go unscheduled for months.

162.    After inspecting an immigrant detention center in Adelanto, California, where

CCS was the medical and mental healthcare provider, a Department of Homeland Security

watchdog found that detainees did not have timely access to proper medical care. According to

the 2018 report, detainees said they had not been seen for months or received their medications

and doctors were indicating they had seen patients they did not actually visit. During a visit to

the detention center, the DHS watchdog found multiple nooses in detainees' cells and heard from

detainees that staff would laugh at detainees and call them "suicide failures" when they returned

from hospitalization due to a suicide attempt.

163.    In a 2018 report investigating conditions at the Hampton Roads Regional Jail, the

Special Litigation Section of the Department of Justice Civil Rights Division found that CCS

provided constitutionally deficient mental healthcare to the people incarcerated at the jail.

Specifically, the Department of Justice found that CCS failed to provide prisoners on its mental

health caseload with (1) individualized treatment plans, (2) their appropriately prescribed

medications and proper medication management, and (3) necessary psychotherapy services. The

report also concluded that CCS was actively failing to properly address the risk presented by

acutely suicidal prisoners on suicide watch. The report found that CCS failed to ensure that

suicidal inmates regularly saw a psychiatrist. The report also found constitutionally problematic

CCS's practice of transitioning inmates from suicide watch directly into restrictive housing and

solitary confinement. Importantly, the Department of Justice observed that CCS provided

inadequate mental health care due to understaffing and found the staffing level of mental health

clinicians to be grossly inadequate. The report found that CCS knew about all of these gross

deficiencies, particularly because of the suicide of multiple inmates, but consciously disregarded

them and continued to provide constitutionally deficient mental healthcare.

164.    In a 2021 DOJ report about the San Luis Obispo County Jail, where Wellpath provided medical and mental health services, the Department of Justice found reasonable cause to believe that the jail failed to provide constitutionally adequate medical and mental health care and denied prisoners with mental health disabilities access to services, programs, and activities. The report concluded that Wellpath failed to provide adequate follow-up mental healthcare and psychotherapy to inmates when necessary and, in fact, seemed to discourage routine follow-up mental healthcare. The DOJ reported systematic problems with medication management which were extremely dangerous to prisoners whose health is threatened by serious medical conditions, including psychotropic medication. Medication mismanagement at the jail included medication that was delayed or not provided at all, wrong dosages or ineffective combinations of medications, and psychiatric staff mismanagement. In San Luis Obispo's jail, the Health Services Administrator reported that she assigned the psychiatrist 50% more patients per day than the psychiatrist felt comfortable seeing and that the psychiatric nurse practitioner reported that she sometimes had as many as 30 patients on her list per day even though she could only see between 10 and 1. The DOJ also noted in the report that Wellpath's health services administrator used a "popular meme" from the television show Downton Abbey to mock prisoner concerns as "whining" during a presentation made to jail leadership. The DOJ report included specific examples. In March 2019, one San Luis Obispo patient was transferred to a county psychiatric facility. When she was transferred back to the jail in April, mental health staff discontinued the medication she was taking at the psychiatric facility. A week later, mental health staff noted signs of mental health deterioration. Another patient sent to the psychiatric facility in March 2019 had to wait eight days to speak with a psychiatrist after returning to the jail, and another five days to receive prescribed psychotropic medications. A clinician noted that during this time,

the patient "articulated apparent delusions." In August 2019, a "psych tech" at the jail administered "a high one-time dosage of an antipsychotic that could have caused an overdose." According to the report, despite exhibiting signs of overdose, there was no indication the man was physically evaluated, and a psychiatric nurse practitioner did not evaluate him until a week after the high dosage of medication. Importantly, the report found that Wellpath's suicide prevention procedures suffered from serious deficiencies, which caused inmates harm and the substantial risk of serious harm. Specifically, the DOJ found that Wellpath did not track the number of suicide attempts or to have de-briefings after suicide attempts. The report found that Wellpath staff routinely failed to make proper assessments of suicidal inmates. It also found that Wellpath allowed Licensed Marriage and Family Therapists to remove individuals from suicide watch without consultation with a psychiatrist, which resulted in inmates routinely being released from suicide watch despite an ongoing risk of suicide. The DOJ found that when inmates are released from suicide watch, Wellpath customarily conducted follow-up using Licensed Marriage and Family Therapists rather than psychiatrists and that there was customarily no structured suicide assessment performed by these officials. All of these customary actions relating to assessment of suicide risk placed inmates at risk of serious harm. Finally, the report found that Wellpath knowingly provided inadequate staffing, which caused inadequate mental healthcare for inmates. Particularly, the DOJ concluded that Wellpath purposefully provided inadequate staffing of psychiatric providers and other mental health staff. It also found that there was inadequate oversight of the mental healthcare at the facility as there was no individual onsite who was responsible for overseeing all aspects of mental healthcare at the jail. As part of this supervisory failure, the DOJ noted that Wellpath did not hold morbidity or mortality reviews after suicides at the jail or provide debriefings after suicides and suicide attempts. Ultimately, the

DOJ concluded that Wellpath knew about all of these gross deficiencies and the risks they posed to inmate health and safety, yet it simply ignored them. The report was shared with Wellpath definitively placing Wellpath on-notice of these deficiencies in the care it was providing to inmates.

165.    In May 2022, a Wellpath-contracted psychiatrist resigned after six months following disagreements over the number of patients he was required to examine each week at a Norfolk, Virginia jail, according to a report by *The Virginian-Pilot*. The psychiatrist stated that he was asked to see a minimum of 50 patients per week in the nine hours he was contracted to work: an average of less than 11 minutes per appointment. The psychiatrist's Wellpath supervisor informed him that this caseload was actually a *reduction* from the schedule of the jail's previous psychiatrist, who saw up to 60 patients per week.

166.    At the Louisville jail in Kentucky, where at least eight people died by suicide at from 2008 to 2019, two incident reports from early February 2022 indicate Wellpath consistently provided no on-site mental health staff during weekends and after 5 p.m. at the jail.

**Wellpath had a custom and practice of providing deliberately indifferent mental healthcare at the CJC.**

167.    Wellpath took over the contract to provide medical and mental healthcare at CJC on or about January 1, 2020. During the previous year, 2019, two CJC inmates died by suicide. In November, a 32-year-old man died and was found hanging in his cell. On June 9, 2019, Holly Peck also died by suicide in the CJC. Wellpath was thus on explicit notice that the risk of detainee and inmate suicide was not only a very serious risk in its jails nationwide, but also a very serious risk at the CJC in particular.

168.    Instead of taking steps to mitigate this risk, Wellpath allowed suicides to continue. Several inmates also died of suicide after Wellpath assumed responsibility for mental healthcare

at the CJC. In May 2020, Michael Roach died by suicide at the CJC. Mr. Roach died in a similar manner to Ms. Archuleta by hanging from the metal grate in his cell. Two months later, in July 2020, Shawn Meehan died by suicide at the CJC under Wellpath's care. Mr. Meehan had a reported history of mental health issues, yet Wellpath provided a recklessly insufficient level of mental healthcare during his incarceration. A few days prior to his death, Mr. Meehan submitted a kite to Wellpath mental health workers asking for help and saying he wanted to hurt himself. Despite this obvious signal that mental health intervention was necessary, as part of a continuing pattern of deliberate indifference by Wellpath officials at the CJC, Wellpath failed to place him on suicide watch before he died. Further, Mr. Meehan committed suicide in the same manner as Ms. Archuleta by hanging himself from the metal grate in his cell.

169.    These two other instances provide further evidence of the customary deliberately indifferent mental healthcare provided by Wellpath both nationwide and at the CJC in particular, along with demonstrating that Wellpath and its officials were on notice that the metal grates in the cells presented an serious risk to suicidal inmates.

### A cascade of lawsuits demonstrates that Wellpath has been customarily deliberately indifferent mental health care to inmates like Ms. Archuleta.

170.    Prior to its merger with Wellpath, CCS had been the subject of nearly 1,400 federal lawsuits. From 2014 until 2019, Wellpath and its predecessor companies were sued for causing more than 70 deaths. One county that terminated its contract after less than two years with one of Wellpath's predecessor companies called the company's performance morally reprehensible. Another said one Wellpath-predecessor-company's failures had turned its jail into a sinking submarine. Former employees have resigned from Wellpath's predecessor companies because working for the companies put their licenses at risk. One employee stated that CCS was only concerned about the almighty dollar and would cut costs at any cost to patient care and

safety.

171.    Wellpath and its predecessor companies ignored obvious signs and symptoms to deny inmates access to obviously necessary mental health care. Such deficiencies are the custom, practice, and standard operating procedure of Wellpath and its related entities. A few examples of Wellpath-predecessor companies' lack of mental health care resulting in preventable suicides are outlined through the details from the lawsuits below.

172.    In *McQuaid v. Wetzel, et al.*, No. 4:21-cv-02019-JPW-WIA, (M.D. Pa. 2021), an inmate died by suicide while detained at the State Correctional Institute, which had a contract with CCS to provide mental health services. The inmate's mental health struggles were well-documented within CCS' records, including a history of depression, a previous suicide attempt, and substance abuse. The inmate also was known to be suffering from bipolar disorder, antisocial disorder, and severe opioid disorder. The inmate attempted suicide while incarcerated and, on the day that he ultimately committed suicide, told CCS officials that he was having suicidal ideations. Despite this, he was not monitored appropriately. The deliberate indifference of CCS officials directly caused the inmate's death.

173.    In *Estate of Scott Hultman et al v. County of Ventura et al.*, No. 2:21-cv-06280-DSF-RAO (C.D. Cal. 2021), an inmate died in the Ventura County Jail by suicide due to the deliberate indifference of CCS officials. The inmate suffered from severe depression, schizophrenia, and bipolar disorder. He also suffered from drug addiction. The inmate had a history of suicidal ideations and had attempted suicide twice in the two months prior to his arrest. When he was arrested, the inmate told the arresting officer that he wanted a police officer to kill him. Despite all of these obvious risk factors, CCS officials placed the inmate in general population. A few days later, the inmate died by suicide by hanging. The deliberate indifference

of CCS officials directly caused the inmate's death.

174.    In *Schiavone v. Luzerne County, et al.*, 3:21-cv-01686-KM (M.D. Pa. 2021), an inmate died in the Luzerne County Jail by suicide due to the deliberate indifference of CCS officials. CCS failed to implement a comprehensive suicide prevention guide and training program at the jail. The inmate who died was exhibiting obvious signs of withdrawal during her detention, including soiling herself and vomiting. She also had previously been diagnosed as bipolar and suffered from depression and anxiety. Records possessed by CCS officials showed that they knew the inmate had been hospitalized for her mental illnesses at least five times in the past seven years. CCS officials also knew that the inmate had contemplated suicide less than a year prior to being incarcerated and that she was a victim of rape. CCS assessed the inmate's need for a mental health referral as urgent but did not follow up to provide the referral or treatment. Upon being admitted to the detention center, the inmate was placed on suicide watch, but three days later (after she begged CCS for help) she was taken off suicide watch. Eight hours after being taken off suicide watch, the inmate was found dead from suicide. The deliberate indifference of CCS officials directly caused the inmate's death. After the inmate's family filed a lawsuit for violation of her constitutional rights, CCS paid to settle the inmate's claims.

175.    In *Estate of Andrew Ricardez v. County of Ventura*, No. 2:20-cv-00079-JFW-AS (C.D. Cal. 2020), an inmate died in Ventura County Jail by suicide due to the deliberate indifference of Wellpath and CFMG officials. The inmate suffered from a history of severe mental illness (schizophrenia) and suicidal ideations, which Wellpath and CFMG officials knew about. The inmate was arrested and taken to jail while in the throes of a mental health crisis. At booking, the inmate was noted to be suicidal, going through methadone withdrawal, depressed, hearing voices, and incapacitated by his mental illness. During his detention, the inmate

displayed clear signs of wanting to end his life, including stabbing his neck, slamming his head against a wall, tying a sock around his neck, and threatening suicide with a specific plan to jump off the top tier. On multiple occasions, the inmate asked to be placed in a rubber cell and to be continuously watched. Wellpath and CFMG officials documented he was in and out of suicide watch. Despite these obvious signs of suicidal ideation, Wellpath and CFMG officials took the inmate off suicide watch. The inmate eventually killed himself in his cell by drowning himself in his toilet bowl. The deliberate indifference of Wellpath and CFMG officials directly caused the inmate's death.

176.    In *Dence v. Wellpath, LLC*, No. 1:20-cv-00671-CL (D. Or. 2020), an inmate was booked into the Josephine County Jail with a known history of mental illness and substance abuse. The inmate was prescribed psychotropic medication. Without basis, Wellpath discontinued that medication within two weeks of her being in the jail. The inmate did not receive any mental health care while in the jail and never saw a psychiatrist. She was placed in a single cell and in segregated housing. She ultimately died by suicide in September of 2018 due to the unconstitutional lack of care provided by Wellpath and its unjustifiable failure to properly classify her as a suicide risk. The deliberate indifference of Wellpath officials directly caused the inmate's death. The deliberate indifference by Wellpath officials led the inmate's family to file a lawsuit against Wellpath for deliberate indifference.

177.    In *Estate of Linda Miller et al. v. County of Sutter et al.*, No. 2:20-cv-00577-DJC-DMC (E.D. Cal. 2020), an inmate died in Sutter County Jail by suicide due to the deliberate indifference of Wellpath and CFMG officials. The inmate exhibited clear symptoms of mental illness, drug withdrawal, and suicidal ideation during the five days she was detained in the jail. During a mental health appointment two days before her suicide, the inmate told Wellpath and

CFMG officials that she had previously attempted suicide twice, was diagnosed with both depression and bipolar disorder, was hallucinating, had previously been placed on suicide watch while incarcerated because of not taking her psychiatric medications (which was also currently happening), and felt presently guilty or worthless. On the day before she committed suicide, the inmate attended a bail hearing where the judge increased her bail to $2 million, ensuring that she would never leave the Sutter County Jail. Despite this, Wellpath and CFMG officials placed the inmate in a non-observation cell in the general population with multiple suicide hazard fixtures. The inmate died by suicide by hanging herself by a bed sheet. The deliberate indifference of Wellpath and CFMG officials directly caused the inmate's death.

178. In *Estate of Roundtree v. Correct Care Sols., LLC*, No. 19-cv-00167-RBJ (D. Colo. 2019), an inmate died by suicide hours after a CCS official acted with deliberate indifference in releasing him from suicide watch. The inmate was arrested for robbery and made suicidal statements during his arrest interview. When he was taken to the Arapahoe County Jail, he was placed on suicide watch by deputies. A CCS official later assessed the inmate, wherein the inmate admitted that he previously attempted suicide approximately three-and-a-half months prior to his arrest and was hospitalized after this suicide attempt. After the assessment, the CCS official inexplicably took the inmate off suicide watch. Hours after being taken off suicide watch, the inmate died by suicide by hanging. The deliberate indifference of CCS officials directly caused the inmate's death. The inmate's estate filed a lawsuit against CCS, which survived summary judgment.

179. In *Johnson et al. v City of Redding et al.*, No. 2:19-cv-01722-JAM-DB (E.D. Cal. 2019), an inmate suffering from serious mental health issues died in jail due to the deliberate indifference of Wellpath and CFMG officials. The inmate was arrested while clearly

experiencing a mental health crisis during which he made numerous suicidal statements. Despite this, and the fact that during intake into the jail the inmate exhibited feelings of guilt, worthlessness, and shame, signs of depression, and was acting incoherently or strange by making outbursts of unusual statements, Wellpath denied him psychiatric treatment. Days later, the inmate was found dead in his cell by suicide. The deliberate indifference of Wellpath and CFMG officials directly caused the inmate's death.

180.    In *Estate of Jesse Binam et al. v. Correct Care Solutions, LLC et al.*, No. 1:19-cv-02561-RM-GPG (D. Colo. 2019), an inmate died in the Mesa County Jail by suicide due to the deliberate indifference of CCS officials. That inmate, upon admission to the jail, informed CCS officials that he had medical and mental health conditions, including depression and seizures, and that he was taking medications for these. Despite this, the inmate was cut off all of his medications. Additionally, one of the CCS officials knew that the inmate suffered from depression and had attempted suicide in the past (for which he was hospitalized). The inmate made multiple calls threatening to kill himself and told court staff that he wanted to be shot. The inmate also attempted suicide while in a holding cell at the courthouse. After attempting suicide, the inmate continued to tell jail officials he wished he were dead and had done something to end his life within the last three months. Despite all of this, the inmate was then taken off suicide watch by CCS officials and placed into a cell by himself. The inmate died by suicide by hanging shortly thereafter. The deliberate indifference of CCS officials directly caused the inmate's death.

181.    In *Biselli v. County of Ventura*, No. 2:19-cv-01722-MWF-PLA, (C.D. Ca. 2019), an inmate, who suffered from serious but treatable mental health disorders (including schizophrenia and bipolar disorder), died from suicide at a correctional facility where CFMG

was contracted to provide mental health care. Throughout the inmate's incarceration, he took a number of actions, and made a number of statements, that put CFMG officials on notice that he was suicidal, including indicating on his intake form that he had attempted to hurt himself ten days prior to his arrest by taking pills, writing on his intake evaluation that he suffered from depression and had attempted suicide multiple times in the past, told CFMG officials on multiple occasions that he wanted to kill himself and planned on hanging himself with his sheets because the demons and voices in his head told him to do so, failing to take care of himself (including eating and taking care of his personal hygiene), and self-harming behavior. The inmate, despite these concerning actions, was not referred to see a psychiatrist or placed onto suicide watch. The inmate ultimately committed suicide. The deliberate indifference of CFMG officials directly caused the inmate's death. The inmate's estate filed a federal lawsuit for the deliberate indifference of CFMG and its officials, and survived summary judgment against CFMG and its officials in that lawsuit. CFMG ultimately settled the claims against it.

182.    In *Louizi v. Fort Bend County, Texas, et al.*, No. 4:18-cv-04821 (S.D. Tx. 2018), an inmate committed suicide in the Fort Bend County Jail where CCS was contracted to provide mental health care. Despite having indicated to CCS officials that he was about to commit suicide, the inmate was not placed on suicide watch. The inmate hung himself with his bedding and there had been numerous other suicides by the same means in the same jail that CCS was aware of. The deliberate indifference of CCS officials directly caused the inmate's death. The inmate's family filed a federal lawsuit against CCS, the lawsuit survived a motion to dismiss from CCS, and the inmate's family settled the lawsuit for an undisclosed sum.

183.    In *Moreno v. Correct Care Solutions*, No. 4:18-CV-5171-RMP (E.D. Wa. 2018), an individual was taken to jail after undergoing a mental health crisis where he was observed

talking to angels and hitting himself in the face while being unable to understand basic questions. The inmate was confined in an isolation cell with no bed, toilet, sink, or access to drinking water — nothing but four padded walls, a floor, and an overhead light that was on for 24 hours a day. The jail social worker observed the inmate through the window of his cell door, describing him each day in a similar way: naked, rolling on the floor, playing with his feces, talking to walls but unresponsive to her questions. She called CCS officials to treat the inmate. A CCS official responded and observed the inmate through the window of his cell door, noting that he was lying naked on the floor, face down and singing. Though the referral for treatment indicated that Mr. Moreno had not had food or drink in four days at that point, the CCS official did not help, contact a psychiatrist, or summon emergency medical personnel. The next day, guards discovered the inmate was dead, his naked body lying face down, covered with feces. He had lost 38 pounds in the eight days since he was booked into the jail. His family sued CCS and settled his legal claims for $4,500,000. The deliberate indifference of CCS officials directly caused the inmate's death.

184.    In 2018, the brother of a Mendocino County man who died while being restrained at the Mendocino County Jail settled a wrongful death lawsuit for $5 million. According to the terms of the settlement, Mendocino County and its insurer agreed to pay $3 million, the city of Willits, California paid $500,000, and Wellpath-predecessor CFMG, which served as the medical provider at the jail, agreed to pay $1.5 million. The inmate died after his June 2014 arrest when he was being held face down on the ground, with his hands cuffed and ankles shackled, by law enforcement officers in a sobering cell at the Mendocino County Jail as a medical staff member watched. His death was caused by the deliberate indifference of CFMG officials. The inmate was a schizophrenic man in psychiatric crisis who received no care from

CFMG officials. The Mendocino County Jail ended its contract with CFMG after the incident, instead hiring a new medical and mental health care provider with more registered nurses on its staff who had a higher level of training than most of the staff from CFMG.

185.     In 2018, Lake County, California agreed to pay $2 million to settle a federal civil rights lawsuit filed by the family of a California social worker who hanged herself at the Lake County Jail. The inmate died in August 2015, after she tore a blanket into strips and hung herself from a sink in a sobering cell while she was supposed to be under close supervision by jail staff. The inmate who hanged herself was disoriented and confused when deputies found her banging on the outer gates to the prison. They took her to the jail, where she was placed in a sobering cell. She hanged herself approximately twenty-six hours later in the same cell, having never received a mental health evaluation by a doctor. Her death was caused by the deliberate indifference of CFMG officials. The case revealed the jail's medical services provider, CFMG, was in violation of state regulations. CFMG medical and mental health staff failed to effectively respond to the inmate's mental health crisis. The family also reached a settlement agreement with CFMG for an undisclosed amount of money. CFMG was using lesser-trained vocational nurses to make key medical and mental health care decisions, which violated state law.

186.     In *Henderson v. Gusman, et al.*, No. 2:17-cv-01916-MLCF-DEK (E.D. La. 2017), an inmate died by suicide in the Orleans Justice Center where CCS contracted to provide mental health care. The inmate suffered from bipolar disorder and paranoid schizophrenia and was taking powerful antipsychotic medications. He requested to be seen by a mental health professional shortly after being booked in the detention center because he had recently suffered a significant loss and had been depressed for at least two weeks. Despite this request, the inmate was placed in general population and was never seen by a mental health professional. Less than a

week later, the inmate attempted suicide while in the shower by hanging himself from an

exposed pipe that was a known suicide risk. The inmate died a few days later from his injuries.

The deliberate indifference of CCS officials directly caused the inmate's death. The inmate

brought a federal lawsuit and settled his claims against CCS for $575,000.

187.    In *Troutman v. Louisville Metro Department of Corrections, et al.*, No. 3:16-cv-

742 (W.D. Ky. 2016), an inmate died by suicide due to the deliberate indifference of CCS

officials. After the inmate was booked into jail, he attempted suicide by wrapping gauze tightly

around his neck but was found by a jail staff member before he died. After that incident, the

inmate explicitly expressed his desire to commit suicide to members of jail staff. The inmate told

jail officials that he was a junkie and had no reason to live because he was going to get twenty

years for his charges. The inmate's daughter also called the detention facility on multiple

occasions and reported to them what she perceived to be her father's very fragile and depressed

state. Despite this, CCS officials cleared the inmate to return to general population, including

allowing him to be placed in a cell that contained implements to commit suicide, including a bed

sheet, a bunk, and barred windows around which the bed sheet could be secured. The inmate

ultimately hanged himself using a bedsheet. After the inmate's estate filed claims for deliberately

indifferent medical and mental health care, CCS settled for an undisclosed amount. The

deliberate indifference of CCS officials directly caused the inmate's death.

188.    In *Estate of Sandra Vela, et al. v. County of Monterey, et al.,* No. 5:16-cv-02375-

BLF (N.D. Cal. 2016), an inmate died by suicide in the Monterey County Jail. CFMG contracted

to provide mental health care at the jail. It was known that the inmate had serious mental health

issues and she was placed on suicide watch. Despite this, CFMG officials took the inmate off of

suicide watch, placed her into a cell with known suicide hazards, and failed to check on her.

After she committed suicide, a CFMG official fabricated CFMG records to falsely show that proper checks had been conducted. The deliberate indifference of CFMG officials directly caused the inmate's death. The inmate's family sued CFMG and its officials in federal court, a judge denied CFMG's motion to dismiss the case, and the case ultimately settled for $2,850,000.

189.    In *Chesnut, et al. v. Correctional Healthcare Companies, Inc., et al.*, No. 4:15-cv-00166-CDL (M.D. Ga. 2015), an inmate died by self-harm in the Muscogee County Jail, which had a contract with CHC to provide mental health services. When the inmate was booked into the jail, she had a known history of mental illness. The inmate suffered from hallucinations and exhibited behavior clearly demonstrative of someone in extreme mental distress. The inmate engaged in multiple acts of self-harm, including throwing herself around her cell and intentionally making herself fall from to the ground until her face bled profusely. Ultimately, the inmate killed herself in her cell because CHC officials failed to implement fifteen-minute wellness checks on her. The deliberate indifference of CHC officials directly caused the inmate's death. The inmate's family filed a federal lawsuit against CHC and its officials that survived summary judgment. The case ultimately settled for an undisclosed sum.

190.    In *Claypole v. County of San Mateo, et al.,* No. 5:14-cv-02730-BLF (N.D. Cal. 2014), an inmate committed suicide three days after being booked in the San Mateo County Jail. CFMG contracted to provide mental health care at the jail. The inmate noted during intake that he had been struggling with substance abuse, anxiety, panic disorders, and bipolar disorder since he was a teenager. The inmate also indicated that he had been receiving psychiatric care. The inmate had been booked into jail after being arrested for fatally stabbing someone during a bipolar episode. While in court related to that charge, the inmate experienced a psychotic episode and asked for medications to treat his mental health disorders. Despite all of this, CFMG officials

did not place the inmate on suicide watch or provide him with any psychiatric treatment. The inmate died by suicide. The deliberate indifference of CFMG officials directly caused the inmate's death. After the inmates' death, his family brought a lawsuit against CFMG, which survived a motion to dismiss and ultimately settled for $1,100,000.

191.    In *Estate of Beauford v. Mesa County, et al.*, No. 1:13-cv-01080-RBJ-BNB (D. Colo. 2013), an inmate housed in Mesa County Detention Center, died from multiple seizures while left unattended by doctors and mental health professionals who knew he was suffering. The inmate's preventable death occurred because of negligence to his serious medical and mental health needs. The inmate had multiple mental health disorders, severe intellectual disability, and epilepsy. Despite this, CCS officials stood by and watched as he engaged in self-harming behavior by refusing critical medications (a manifestation of his serious mental health disorders) and suffered seizure after seizure until he died. Judgement was entered against CCS for its negligent treatment of the inmate.

192.    Wellpath has provided (or rather, failed to provide) mental health care services in a number of county jails in Colorado that have experienced a spate of suicides. For example, in Adams County, seven suicides took place during Wellpath's tenure. Wellpath was the only provider for Jefferson County and was responsible for nine suicides in that jail. Arapahoe County has reported four suicides since Wellpath took over mental health care.

193.    Since Ms. Archuleta's death, El Paso County has terminated its contract with Wellpath.

## CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Deliberately Indifferent Medical and Mental Health Care and Treatment**
*Estate of Dezaree Archuleta Against All Defendants*

194.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

195.    At all times relevant to the allegations in this Complaint, Defendants acted or failed to act under color of state law.

196.    Defendants are persons under 42 U.S.C. § 1983.

197.    At all times relevant to the allegations in this Complaint, Defendants knew of Ms. Archuleta's diagnosed major depressive disorder, of the symptoms thereof, with anxious distress, post-traumatic stress disorder, hallucinations, delusions, self-harming behavior, and suicidal ideation, which were life-threatening medical and psychological conditions during her stay at the CJC.

198.    Defendants deliberately failed to obtain appropriate treatment or help for Ms. Archuleta's serious and obvious medical needs.

199.    With deliberate indifference to Ms. Archuleta's constitutional right to adequate medical and mental health care, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendants knowingly failed to adequately examine, treat, monitor, supervise, and/or care for Ms. Archuleta's condition. They did so despite their knowledge of Ms. Archuleta's serious medical and mental health needs, thereby placing her at risk of serious physical harm, including death. Therefore, Defendants knew or were aware that Ms. Archuleta faced a substantial risk of serious harm and disregarded this excessive risk by failing to take measures to reduce it.

200.    When Ms. Archuleta alerted Defendants to her need for medical and mental health assistance, Defendants acted with deliberate indifference to Ms. Archuleta's obviously

serious medical need and constitutional rights by failing to obtain and provide medical and mental health treatment for her in a timely and appropriate fashion.

201.    All of the deliberately indifferent acts of each individual Defendant were conducted within the scope of their official duties and employment.

202.    Ms. Archuleta had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to her known serious medical and mental health needs.

203.    Each individual Defendant knew or should have known of this clearly established right at the time of Ms. Archuleta's death.

204.    At all times relevant to the allegations in this Complaint, the individual Defendants were acting pursuant to Wellpath's and H.I.G.'s custom, policy, or practice in their actions (and inactions) pertaining to Ms. Archuleta.

205.    At all times relevant Defendants Wellpath and H.I.G. Capital were willfully participants in a joint activity and acting under color of state law, as the legal and functional equivalent of a municipality providing medical and mental health care to inmates, including Ms. Archuleta.

206.    Defendants Wellpath's and H.I.G. Capital's deliberately indifferent and unconstitutional policies, customs, and/or practices regarding provision of constitutionally inadequate medical care as described herein were the moving and proximate cause of Ms. Archuleta's injuries.

207.    Defendants Wellpath and H.I.G. Capital were deliberately indifferent in their failure to properly train and supervise their employees to provide necessary medical care, including mental health services, to detainees at the CJC.

208. The failures in training, supervision, and policy regarding providing necessary medical assessment and care were so obvious that the failure to provide medical assessment and care was deliberately indifferent to the rights of Ms. Archuleta.

209. Defendants Wellpath's and H.I.G. Capital's deliberately indifferent customs, and failures to train/supervise, are all actionable policy decisions that were moving forces and proximate causes of the violation of Ms. Archuleta's constitutional rights.

210. Defendants Wellpath and H.I.G. Capital had a pervasive pattern of civil rights and human rights violations, including unjustifiable failure to provide needed mental health services at detention facilities where it was the contracted provider.

211. Defendant Mohr had a duty to train and supervise mental health service providers, provide proper mental health care to inmates, properly staff the CJC with appropriate mental health staff, and/or train Wellpath personnel to properly monitor inmates who suffer from severe mental illness.

212. Defendant Mohr failed to discharge this duty.

213. Defendant Mohr acted recklessly, intentionally and with deliberate indifference to the medical and mental health needs of Ms. Archuleta in failing to adequately staff the CJC, provide proper mental health care and monitoring to inmates, and/or adequately train and supervise Wellpath personnel in meeting the mental health care needs of inmates.

214. Defendants' acts or omissions were the legal and proximate cause of Ms. Archuleta's injuries and death.

215. The acts and omissions of each individual Defendant caused Ms. Archuleta damages in that she suffered extreme physical and mental pain and death while she was in Defendants' custody.

216.    The intentional actions or inactions of each Defendant as described herein intentionally deprived Ms. Archuleta of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiff Estate damages, including compensatory, economic, consequential, and special damages, along with loss of enjoyment of life, loss of companionship and association with family members, suffering, emotional distress, mental anguish, inconvenience, and loss of income.

217.    Plaintiff Estate is entitled to punitive damages against the individual Defendants, in that their actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Ms. Archuleta.

### SECOND CLAIM FOR RELIEF
### Colo. Rev. Stat. § 13-21-201 *et seq.*
### Negligence and Negligent Supervision and Training Causing Wrongful Death[2]
#### *Plaintiff Shelly Romero Against All Defendants*

218.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

219.    Wellpath is a private corporation that contracted to provide medical and mental health services to inmates at the CJC.

220.    Defendants H.I.G. Capital, Wellpath, Mohr, Keaveny, and Wesolowski are private "persons," not governmental actors, and as such are not entitled to any immunity under the CGIA.

221.    Defendants Wellpath and H.I.G. Capital are vicariously liable for the negligent acts and omissions by their agents and/or employees, including, but not limited to Defendants

---

[2] Although not required, Plaintiffs hereby give notice that they may seek to amend the Complaint to add punitive damages against these Defendants because the injuries complained of are attended by circumstances of fraud, malice, or willful and wanton conduct.

Mohr, Keaveny, Wesolowski and other medical and mental health workers, whether or not they
are defendants to this claim.

222.    Defendants Wellpath and H.I.G. Capital are directly liable for their own negligent
failures in training, supervision, staffing, policies, and practice.

223.    At all times relevant to this action, Ms. Archuleta was under the medical and
mental health responsibility, care, and treatment of Defendants H.I.G. Capital, Wellpath, Mohr,
Keaveny, and Wesolowski.

224.    Defendants Mohr, Keaveny, Wesolowski, and other medical and mental health
workers at CJC had a duty to provide medical and mental health care to detainees and inmates at
the CJC, including Ms. Archuleta. This included a duty to provide reasonable care to prevent
detainees and inmates known to be at risk of suicide and self-harm from suicide and self-harm, a
duty to properly classify such detainees and inmates, a duty to house them accordingly, and a
duty to reasonably supervise and monitor detainees and inmates at risk of self-harm and suicide.

225.    All Wellpath employees who interacted with Ms. Archuleta during her
incarceration at the CJC, including, but not limited to Defendants Keaveny and Wesolowski, had
doctor-patient, psychologist-patient, counselor-patient, or nurse-patient relationships with Ms.
Archuleta, and at all times relevant were acting within the scope of their employment and special
relationship with Ms. Archuleta.

226.    Defendants H.I.G. Capital, Wellpath, Mohr, Keaveny, and Wesolowski owed Ms.
Archuleta a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised
by and expected of medical and mental health professionals in similar situations.

227.    Through their actions and omissions, Defendants Mohr, Keaveny, Wesolowski,
and other medical and mental health workers employed by Wellpath/H.I.G., breached their

standards of care and were negligent in failing to properly assess, monitor, treat, and care for Ms.

Archuleta, including, but not limited to the following: failing to adequately assess Ms.

Archuleta's risk of self-harm or suicide; failing to provide Ms. Archuleta with psychiatric care;

failing to provide Ms. Archuleta with medication to treat her symptoms of major depressive

disorder and post-traumatic stress disorder, which included risk of suicide and self-harm; failing

to properly classify Ms. Archuleta as a high suicide risk; failing to adequately house Ms.

Archuleta consistent with the known risk of self-harm she presented; failing to adequately

supervise and monitor Ms. Archuleta to mitigate her risk of self-harm; and failing to remove Ms.

Archuleta or otherwise address the known risk of the grate in her cell from which she hung

herself.

228.    These duties of care are informed by state law. Under C.R.S. § 16-3-401,

"prisoners arrested or in custody shall be treated humanely and provided with adequate food,

shelter, and, if required, medical treatment." The provision of adequate medical treatment and

humane care is a statutory obligation.

229.    Defendants H.I.G. Capital and Wellpath also had a duty to exercise reasonable

care in the training and supervision of their employees, a duty to reasonably staff the facilities

where they contracted to provide medical and mental health care, and a duty to develop and

implement reasonable policies and practices in support thereof.

230.    Defendants H.I.G. Capital and Wellpath breached this duty of care by failing to

reasonably train their employees to recognize well-known red flags that indicate that an inmate is

suicidal or at risk of self-harm, failing to reasonably supervise their employees who assessed or

provided care to detainees and inmates at heightened risk of suicide and self-harm, failing to

adequately staff the CJC with mental health service providers, failing to provide psychiatric care

and medication to inmates suffering from mental health issues and who were are risk of self-harm and suicide, failing to develop and implement reasonable policies and practices with respect to detainees and inmates at risk of self-harm, and placing Ms. Archuleta in an incarceration setting where she could readily act out her suicidal and self-harming impulses.

231.    The negligent acts and omissions by Defendants H.I.G. Capital, Wellpath, Mohr, Keaveny, and Wesolowski were a substantial and significant contributing proximate cause of Ms. Archuleta's self-harming behavior and eventual suicide.

232.    Defendants' conduct constituted a felonious killing under C.R.S. §§ 13-21-203 and 15-11-803, in that their conduct caused the death of Ms. Archuleta and that they consciously disregarded a substantial and unjustifiable risk that their conduct would cause the death of Ms. Archuleta.

233.    As a direct and proximate result of the acts, omissions, and violations alleged above, Plaintiffs have suffered damages, including compensatory, economic, consequential, and special damages, along with loss of enjoyment of life, loss of companionship and association with family members, suffering, emotional distress, mental anguish, inconvenience, and loss of income.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award them all relief as allowed by law and equity, including, but not limited to the following:

a.    Declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages as established at trial;

c.    Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation,

discomfort, fear, anxiety, loss of enjoyment of life, loss of relationships, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

d.  Punitive damages for all claims as allowed by law in an amount to be determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including but not limited to:

    i.  Issuance of a formal written apology from each Defendant to Plaintiffs;

    ii.  The imposition of policy changes designed to avoid future similar misconduct by Defendants; and

    iii.  Mandatory training designed to avoid future similar misconduct by Defendants;

f.  Pre-judgment and post-judgment interest at the highest lawful rate;

g.  Attorney's fees and costs; and

h.  Such further relief as justice requires.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 14th day of April 2024.

<div style="margin-left:40%">

NEWMAN | MCNULTY, LLC

*s/ Andy McNulty*
_____
Mari Newman
Andy McNulty
1490 Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFF

</div>