IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-00997-SKC-KAS

SHELLY ROMERO, individually and as personal representative of the Estate of
Dezaree Nicole Archuleta,

      Plaintiff,

v.

WELLPATH HOLDINGS, INC. LIQUIDATING TRUST, as a nominal defendant,
MATTHEW J. DUNDON, in his capacity as trustee for the Wellpath Holdings, Inc.
Liquidating Trust, as a nominal defendant,
CHRISTINE MOHR, in her individual and official capacities,
EDWARD KEAVENY, in his individual and official capacities, and
MICHELLE WESOLOWSKI, in her individual and official capacities,

      Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on Plaintiffs' **Motion to Compel Defendant
Wellpath to Produce Documents Pursuant to Fed. R. Civ. P. 45** [#129] ("Motion").
Wellpath LLC,[1] then a nominal defendant in this case, responded in opposition. *Response*
[#141].

On April 14, 2026, the Court held an evidentiary hearing on the Motion, heard
argument, and took the matter under advisement. *See Courtroom Mins.* [#165]. During
the hearing, Wellpath presented the testimony of Elizabeth Sampson, the Vice President
of Quality Improvement at Wellpath. *Id*. Additionally, both sides examined Ms. Sampson

---

[1] Following briefing of this discovery dispute, Wellpath Liquidating Trust was substituted for
Defendant Wellpath LLC, by court order on the parties' Joint Motion to Substitute and Amend
Case Caption [#156]. *See Courtroom Mins.* [#165] at 1 (granting motion and setting deadline for
filing of amended complaint with updated parties).

and presented exhibits, which the Court admitted into evidence. *Id*. The Court has reviewed the parties' briefs, the hearing audio recording, and pertinent filings from *Estate of Canett v. Wellpath, et al.*, No. 23-cv-01211-DDD-MDB, including testimony elicited during an evidentiary hearing in that case and Magistrate Judge Dominguez Braswell's order adjudicating a similar discovery dispute. The Court has also reviewed the El Paso County-Wellpath Services Contract [#177], which Plaintiff filed as an additional exhibit. For the reasons stated below, the Motion [#129] is **granted in part** and **denied in part**.

## I.   Background

This case arises from the suicide death of Dezaree Nicole Archuleta, a detainee in the El Paso County Criminal Justice Center ("El Paso Jail"). *Third Am. Compl.* [#170] at 1. Plaintiffs allege that "Defendant Wellpath [which provided medical and mental health care to jail detainees pursuant to a contract with El Paso County] and its officials were aware of, but callously ignored the almost constant pleas for help from Ms. Archuleta and signals that she was at significant and immediate risk of suicide." *Id*. ¶ 1; *see also id*. ¶ 16. Plaintiff Shelly Romero, as personal representative of Ms. Archuleta's estate, and on her own behalf, asserts a 42 U.S.C. § 1983 claim for deliberate indifference, as well as a state law claim for negligence causing wrongful death. *Id*. ¶¶ 182-220. Plaintiffs allege that Defendants' failures were "part of a continuing pattern of deliberate indifference by Wellpath officials at the [El Paso Jail]. *Id*. ¶ 38.

This discovery dispute arises from a subpoena Plaintiffs issued to Wellpath LLC, then a nominal defendant. *See Courtroom Mins.* [#116] (determining that discovery from Wellpath LLC must proceed under Fed. R. Civ. P. 45); *see also Second Am. Compl.* [#91] (listing Wellpath LLC as a nominal defendant). In relevant part, the dispute concerns two categories of documents:

Document Request No. 3: Please produce all documents related to any internal or external investigation that was conducted (whether formal or informal and whether pending or concluded) by any individual or entity related to the detention and/or death of Dezaree Archuleta.

Document Request No. 15: Produce all records relating to mortality reviews, morbidity reports, root cause analyses, sentinel event reports, or any similar type of internal investigations or reviews[.]

*Subpoena* [#129-1] at 8, 14.

Asserting privilege, Wellpath has withheld two responsive documents: (1) Part III of a Mortality and Morbidity Review and (2) a suicide safety analysis. *See Hr'g Audio* at 1:51:00-1:52:12. Wellpath contends that those documents are protected under the Patient Safety Quality Improvement Act of 2005 (PSQIA), 42 U.S.C. § 299b-22, which grants privileges to information gathered and produced in pursuit of patient safety "to incentivize the health care industry 'to identify and learn from errors.'" *Response* [#141] at 9 (quoting *Sunrise Hosp. and Med. Ctr., LLC v. Eighth Jud. Dist.*, 544 P.3d 241, 247 (Nev. 2024)).

## II. Legal Standard

Federal Rule of Civil Procedure 45 governs discovery from nonparties; it permits a party to command a person to produce documents, electronically stored information, or tangible things at a specific time and place. "The scope of discovery under a subpoena is the same as party discovery permitted by Fed. R. Civ. P. 26." *In re EpiPen (Epinephrine Injection, UPS) Mktg., Sales Pracs. and Antitrust Litig.*, No. 17-md-2785-DDD-TJJ, 2018 WL 2926581, at *2 (D. Kan. June 11, 2018). Therefore, a party may obtain discovery from a nonparty "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" FED. R. CIV. P. 26(b)(1). The nonparty resisting discovery on grounds of privilege bears the burden of establishing such

3

protection. *See*, *e.g.*, *Beltran v. InterExchange, Inc.*, No. 14-cv-03074-CMA-CBS, 2018 WL 839927, at *3 (D. Colo. Feb. 12, 2018).

### III. Analysis

Plaintiffs seek production of two documents Wellpath generated in the wake of Ms. Archuleta's death in El Paso Jail: (1) Part III of a Mortality and Morbidity Review and (2) a suicide safety analysis. Wellpath argues that both documents are not discoverable because they are privileged under the Patient Safety Quality Improvement Act ("PSQIA"), 42 U.S.C. §§ 299b-21 to 299b-22. *Response* [#141] at 8. Plaintiff argues that Wellpath gathered information and generated these documents for purposes in addition to patient safety quality improvement and, therefore, the information is discoverable.

42 U.S.C. § 299b-22(a)-(b) deems patient safety work product privileged and confidential and not discoverable in a federal civil proceeding or otherwise subject to disclosure, with some statutory exceptions to privilege and confidentiality. "Patient safety work product" includes "any data, reports, records, memoranda, analyses (such as root cause analyses), or written or oral statements[,] which "are assembled or developed by a provider for reporting to a patient safety organization and are reported to a patient safety organization[.]" 42 U.S.C. §§ 299b-21(7)(A)(i)(I). Patient safety work product also includes data, analyses, written or oral statements, or the like "which identify or constitute the deliberations or analysis of, or identify the fact of reporting pursuant to, a patient safety evaluation system." 42 U.S.C. §§ 299b-21(7)(A)(ii). However, patient safety work product does not include "information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system." 42 U.S.C. § 299b-21(7)(B)(ii). This exclusion applies even if that "separate information or a copy thereof [is] reported to a patient safety organization." 42 U.S.C. § 299b-21(7)(B)(ii). Therefore, the PSQIA does

4

not bar the discovery or admissibility of "information that is collected, maintained, or developed separately, or exists separately, from a patient safety evaluation system" in a civil proceeding. 42 U.S.C. § 299b-21(7)(B)(iii)(I). With this legislative framework in mind, the Court must determine for what purpose Part III of the Mortality and Morbidity Review and the suicide safety analysis were assembled and whether they were reported to a patient safety organization pursuant to a patient safety evaluation system.

## A.    Part III of the Mortality and Morbidity Review

The Mortality and Morbidity Review is part of Wellpath's process "to conduct a thorough review of all deaths in custody to verify best practices; to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; to identify issues that require further study; and to prevent future deaths." *Wellpath Ex. F*, *Wellpath/El Paso County Jail Procedure in the Event of a Patient Death*, § 1. The Mortality and Morbidity Review consists of two kinds of review, a clinical mortality review and an administrative mortality review, which must occur within 30 days of an in-custody death. *Id*., § 3.

The clinical mortality review exclusively involves Wellpath's staff, particularly the healthcare staff, as well as Wellpath's in-house counsel, clinical risk manager, patient safety officer, Regional or Corporate Office CQI (Continuous Quality Improvement) representative, Director of Operations, and Regional Medical Director. *Id*., § 6.3; *see also Hr'g Audio* at 3:40:00-3:41:15 (testimony of Elizabeth Sampson, Wellpath's VP of Quality Improvement). This review assesses "the clinical care provided and the circumstances leading up to a death" and serves to identify areas of improvement for patient care or system policies and procedures. *Id*. at 2 ("Definitions," "Clinical Mortality Review"). Wellpath treats clinical mortality reviews as patient safety work product because, per

policy, the information for those reviews is developed as part of the Patient Safety Evaluation System. *Wellpath Ex. F*, § 3. Because Wellpath deems that information patient safety work product, it prohibits the release of that information outside Wellpath. *Id*.

The administrative mortality review includes Wellpath officials and jail custodial staff. *Wellpath Ex. F*, § 6.5; *see also E. Sampson Test., Hr'g Audio* at 3:39:02-3:41:15. The review assesses the "correctional and emergency response actions surrounding a patient's death[.]" *Wellpath Ex. F* at 2 ("Definitions," "Administrative Mortality Review").

The Mortality and Morbidity Review consists of three parts. Part I is a review of patient information, akin to a chart review. *E. Sampson Test., Hr'g Audio* at 2:15:22-2:16:02; *Wellpath Ex. F*, § 6.2 (mandating completion of a Patient Information Report and submission to the Corporate Office for review prior to the Clinical and Administrative Mortality Reviews). It contains demographic information about the deceased inmate, cause of death, any prior suicide attempts, any delays in care, and a timeline surrounding the inmate's death. *Pl. Ex. 5* (Part I of Ms. Archuleta's Mortality & Morbidity Review). Part II contains a list of individuals who participated in the mortality review and identifies the action items from the improvement plan that needs implementation. *E. Sampson Test., Hr'g Audio* at 2:16:10-2:16:30; *see also Pl. Ex. 4* (Part II of Ms. Archuleta's Mortality & Morbidity Review). Part III is a final, all-encompassing analysis of the information Wellpath reviewed—including information from and prepared for the clinical mortality review and the administrative mortality review. *E. Sampson Test., Hr'g Audio* at 2:16:31-2:16:58. According to Ms. Sampson, it is the "final culmination" of patient safety quality improvement information, including system-level or site-level opportunities to improve patient safety, before Wellpath's submission of it to the Patient Safety Organization. *Id*.

at 2:18:05-2:18:49. Ms. Sampson testified that Part III is not shared with El Paso County, jail staff, or any individual outside the patient safety evaluation system at any point during the Mortality and Morbidity Review. *E. Sampson Test., Hr'g Audio* at 2:20:35-2:21:05. She further testified that the improvement plan and its action items are the only mortality review findings discussed with staff outside the patient safety evaluation system. *Id.* at 2:16:02-2:16:31.

However, despite that testimony, Wellpath's El Paso County Jail Policies & Procedures contemplate that the Responsible Health Authority (Wellpath) would review the Report and Recommendation at the Administrative Mortality Review meeting with custodial staff[2], where recommendations for future improvements would also be discussed. *See Wellpath Ex. F*, § 6.4 at 6 (directing the health authority to "review[] the areas on Form 01c Reports and Recommendations and any other relevant factors to the specific event"). During the April 14, 2026 evidentiary hearing, the Court asked Ms. Sampson whether the "Report and Recommendation" is Part III, Ms. Sampson explained that it was a "draft" that referred to "content" that made its way into Part III, but the Report and Recommendation was not actually Part III. *E. Sampson Test., Hr'g Audio* at 3:02:45-3:03:13, 3:25:00-3:26:08. In the Court's view, this is a distinction without a meaningful difference. Though that draft was a precursor to the final Part III, it was shared and discussed with attendees of the administrative review meeting to inform them of Wellpath's findings and to alert them to Wellpath's proposals for an improvement plan. *Id.*

---

[2] *See Wellpath Ex. F*, § 6.5 (identifying Administrative Mortality Review invited participants, including "Facility Administrator, Custody/client representative.").

at 3:25:00-3:26:39;[3] *see also id*. at 2:51:20-2:51:30 (acknowledging that the "content" of

Part III is "verbally shared" by whomever is leading the administrative review meeting).

Wellpath's El Paso County Jail Policies and Procedures support this conclusion.

Those procedures articulate actions items for completion during the administrative

mortality review. *Wellpath Ex. F* § 6.4 at 6. According to those procedures, the responsible

health authority—Wellpath—or its health services administrator submits

recommendations regarding future improvements to the CQI committee for review at a

subsequent committee meeting. *Id*. At that meeting, the CQI committee reviews the

results of the mortality review. *Id*. at 7. That CQI meeting includes County representatives.

*Est. of Canett v. Wellpath*, No. 23-cv-01211-DDD-MDB, *Hr'g Tr.* [#128] ("Canett Hrg.") at

27:18-24, 54:20-22. The policies mandate the taking of meeting minutes but expressly

forbid "inclu[sion] [of] identifying details from the Mortality Review" in those minutes. *Id*.

The express mandate to not include identifying information in the minutes suggests that

identifying information may be discussed. The policies also require the CQI Committee to

"destroy[] copies of Part III . . . on the local level" at the administrative review process's

final conclusion. *Id*. Per these provisions, Wellpath's policies contemplate that information

from Part III is used and discussed during the CQI committee meeting with the County.

While the Court does not question Ms. Sampson's credibility, her direct knowledge

of the matter only goes so far. She did not participate in the Administrative Review

meeting regarding Ms. Archuleta's death. *See Pl. Ex. 4, Part II – Mortality & Morbidity

Review Meeting*; *E. Sampson Test., Hr'g Audio* at 2:40:37-2:42:57. However, Dr.

---

[3] Further, while additional information sometimes comes to light after the administrative review meeting, that did not happen here, and the draft Part III became final after the administrative review. *Id*. at 3:23:35-3:26:47

Christine Mohr did. *See id*. While Dr. Mohr did not testify in the evidentiary hearing before this Court, she testified in an evidentiary hearing on a similar issue in *Estate of Canett v. Wellpath, LLC*, No. 23-cv-01211-DDD-MDB. According to her testimony, Dr. Mohr did not bring copies of Part III to those administrative review meetings. *Canett Hrg. Tr.* [#128] 85:1-4. However, information from Part III informed and shaped her discussion during those meetings, even if she did not get into the specifics of which Wellpath employees were at fault. *See id*. at 87:10-88:9, 88:17-25, 92:10-20. Further, Dr. Mohr's testimony confirmed that recommended improvements, presented in the form of a performance improvement plan, are the product of the Part III deliberation and analysis. *See id*. at 48:2-7, 86:22-25. Therefore, Part III served more than one purpose. In addition to being sent to a patient safety organization, it was also used to conduct the Administrative Review meeting and to develop and discuss a performance improvement plan. *See Est. of Hultman v. County of Ventura*, No. CV 21-06280-DSF (RAOx), 2022 WL 2101723, at *8 (C.D. Cal. May 16, 2022) (ordering production of Part III upon finding that the Clinical Mortality Review and the Administrative Mortality Review are "intertwined" with respect to Part III).

Part III served yet two other purposes: (1) to satisfy the National Commission on Correctional Health Care (NCCHC) Services' accreditation requirements and (2) to satisfy Wellpath's contract with El Paso County. Specifically, to maintain accreditation, Wellpath must satisfy NCCHC's procedures in the event of an inmate death. *See Pl.'s Ex. 1, NCCHC Health Servs. Accreditation Rep*. Those procedures include conducting a clinical mortality review within 30 days, conducting an administrative review in conjunction with

custody staff, conducting a psychological autopsy within 30 days, and incorporating these standards into written policy and procedures. *Id*. at 11, § J-A-09.

Additionally, Wellpath's contract with El Paso County requires Wellpath to institute and operate "a quality assurance program consistent with the ACA [American Correctional Association] and NCCHC [National Commission on Correctional Health Care] Medical Quality Assurance Program[.]" *Services Contract* [#177] at 13 § H(2). The Wellpath-El Paso County contract also requires Wellpath to maintain accreditation by the ACA and the NCCHC. *Id*. § A(1). The contract further requires Wellpath personnel to hold monthly meetings with detention officials and facility staff "to provide feedback relative to the Quality Assurance/Action program so that any deficiencies or recommendations may be acted upon." *Id*. § H(3). The contract also obligates Wellpath to provide monthly reports that "delineate the status of the [Jail's] healthcare program, including potential problems and suggested resolutions." *Id*. at 14.

Because Wellpath created Part III for purposes other than, or in addition to, submission to a patient safety organization, the Court concludes Wellpath has failed to demonstrate that it is privileged under the PSQIA. *See Dence v. Wellpath, LLC*, No. 20-cv-00671-CL, 2022 WL 17261009, at *3-4 (D. Or. Nov. 29, 2022) (ordering production of Mortality and Morbidity Report, including Part III, upon concluding that it was created to fulfill contractual obligations with the county and to report to a patient safety organization). Therefore, the Court **grants** Plaintiff's Motion to Compel [#129] and **orders** Wellpath to produce Part III, subject to the Protective Order [#58] in this case.

10

**B.     Suicide Safety Analysis**

Plaintiff also asks the Court to compel the production of the suicide safety analysis. The suicide safety analysis is distinct from a psychological autopsy, which Wellpath has produced.

Per Wellpath's El Paso County Jail Policy, "[a] psychological autopsy is performed on all deaths by suicide within 30 days." *Wellpath Ex. F*, § 3 at 1. The psychological review is part of the already-discussed mortality review. *Id*. § 5 at 2. It is "a written reconstruction of an individual's life," conducted by qualified mental health professional, such as a psychologist, and shared during the administrative review meeting with county officials. *Id*.; *E. Sampson Test., Hr'g Audio* at 2:19:00-2:19:47. In contrast, the suicide safety analysis is a separate document not shared with custodial staff but submitted to the patient safety organization. *E. Sampson Test., Hr'g Audio* at 2:33:58-2:34:10. The suicide safety analysis consists of an in-depth review of the situation and reconstructs the deceased inmate's medical and mental health history, while also considering factual information about the inmate. *Id*. at 2:33:59-2:34:15. The Regional Mental Health Director or licensed psychologist conducts the suicide safety analysis and provides recommendations for Wellpath's consideration. *Id*. The suicide safety analysis conducted following Ms. Archuleta's death was submitted to a patient safety organization. *Wellpath Ex. C, Email*. While Ms. Sampson testified that the "content" of the suicide safety analysis (and Part III) is "verbally shared" with attendees at the administrative review meeting, that testimony may have been confused with the psychological autopsy. *Id*. at 2:51:20-2:51:30.

Beyond Ms. Sampson's brief, unexplored testimony that the content of the suicide safety analysis is discussed at the administrative review meeting, nothing in the record

11

indicates that it was conducted for reasons other than reporting to a patient safety organization. NCCHC does not appear to require a suicide safety analysis; instead, it requires a psychological autopsy. *Pl. Ex. 1*, *NCCHC Health Services Accreditation Report*. Wellpath's El Paso County Jail Policy also does not require it. *Wellpath Ex. F*, at § 6.2 at 4-5, § 6.7 (requiring a psychological autopsy, "if applicable"). El Paso County Sheriff's Office's Critical Incidents Policy also does not require it. *See Policy* [#120-3, Case No. 23-cv-01211-DDD-MDB] at 6 (requiring preparation of psychological autopsy).[4] And it is not required by the Wellpath-El Paso County contract. *See, e.g.*, *Contract* [#177] § A(1) at 12 (requiring compliance with County policies and maintenance of accreditation with accrediting bodies). This leads the Court to conclude that the suicide safety analysis was "assembled or developed by [Wellpath] for reporting to a patient safety organization" and was "reported to a patient safety organization." 42 U.S.C. § 299b-21(7). Thus, the suicide safety analysis meets the PSQIA's definition of patient safety work product and is therefore privileged. Accordingly, the Court **denies** Plaintiff's Motion [#129] and declines to compel production of the suicide safety analysis.

### IV.    Conclusion

For the foregoing reasons,

IT IS **ORDERED** that Plaintiff's **Motion to Compel** [#129] is **granted in part** and **denied in part**.

IT IS FURTHER **ORDERED** that nonparty Wellpath shall produce Part III, subject to the Protective Order [#58], **by August 24, 2026**.

---

[4] This policy was filed under Level 1 restriction, which limits its access to the parties and the court. *See* D.C.COLO.LCivR 7.2(b).

12

Dated: August 9, 2026                    BY THE COURT:


Kathryn A. Starnella
United States Magistrate Judge